IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IN RE:                                                CASE NO.:  19-14362-AJC

DEQUEEN MEDICAL CENTER, INC.,                         CHAPTER 11

          DEBTOR.                                     *EMERGENCY HEARING
_____/                    REQUESTED*

### EMERGENCY MOTION TO DISMISS CHAPTER 11 CASE AND INCORPORATED BRIEF IN SUPPORT[1]

> CREDITOR AND PARTY IN INTEREST, SEVIER COUNTY, RESPECTFULLY REQUESTS A HEARING BE SCHEDULED *ON OR BEFORE THURSDAY, APRIL 11, 2019* TO (A) PREVENT CONTINUING HARM TO THE CITIZENS OF SEVIER COUNTY AND (B) RETURN THE HOSPITAL AT ISSUE IN THIS CASE TO FUNCTIONING STATUS, AS FURTHER EXPLAINED BELOW.

Creditor and party in interest, Sevier County of the State of Arkansas ("Sevier County" or "County"), through undersigned counsel, hereby moves the Court on an emergency basis to dismiss the Chapter 11 bankruptcy case commenced by Debtor, DeQueen Medical Center, Inc. ("Debtor" or "DMCI"), pursuant to 11 U.S.C. §§ 305(a) and 1112(b) for the following reasons:

1.       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Pursuant to 11 U.S.C. § 157(b)(2), this is a core proceeding.

### I. Background

2.       Jorge Perez[2], as the purported president of DMCI, initiated this bankruptcy case,

---

[1] Attached hereto as Exhibit "E" is the Declaration of Rachel Matheson in Support of this Motion.
[2] Sevier County respectfully directs the Court's attention to the following articles regarding the questionable conduct of Mr. Perez and his related business entities – conduct that is strikingly similar to the matters discussed herein:  Jim Axelrod, *How Some Rural Hospitals Were Used to Score Huge Paydays,* https://www.cbsnews.com/news/how-some-rural-hospitals-were-used-to-score-huge-paydays/ (last visited April 4, 2019); Dan Margolies & Bram Sable-Smith, *Woes Pile Up for the Man Once Greeted as Savior of Rural Hospitals,* https://www.kbia.org/post/woes-pile-man-once-greeted-savior-rural-hospitals (last visited April 6, 2019).

improperly and without the requisite authority, by filing a voluntary Chapter 11 petition on behalf of DMCI on Wednesday, April 3, 2019.

3.      DMCI's sole business is the ownership and operation of a community hospital located in DeQueen, Sevier County, Arkansas.

4.      DMCI is a corporation organized under the laws of the State of Arkansas with its principal place of business in DeQueen, Sevier County, Arkansas. DMCI operates a licensed Critical Access Hospital in DeQueen, Arkansas, and its emergency room provides the only emergency services within an hour's drive of many locations in Sevier County (the "Hospital").

5.      Sevier County has an official population of approximately 17,100 residents.  In addition, Sevier County believes there are another approximately 2,600 undocumented residents who live in Sevier County to whom the Hospital provides the only access to medical services for them.  Unquestionably, the continued operation of the Hospital is of vital importance to the health and welfare of the citizens and residents of Sevier County.

6.      DMCI is insolvent and is unable to pay its debts as they become due. Many employees of DMCI have either been laid off or have quit their employment because they have not been paid. Further, healthcare professionals essential to the operation of the Hospital and to its continued licensure have discontinued providing medical services due to nonpayment.

7.      Indeed, as of the date of this Motion, the Hospital has no healthcare professionals, no supplies, no food, and accordingly, no patients despite its capacity with twenty-five (25) hospital beds.

8.      DMCI previously received notice of violations of the Emergency Medical Treatment and Labor Act and various Centers for Medicare and Medicaid Services ("CMS") regulations by the Arkansas Department of Health ("ADH") that were required to be corrected

pursuant to an approved corrective action plan by March 29, 2019.

9.      Raj Ravi, acting for DMCI as the hospital administrator, submitted a corrective action plan to CMS and to ADH on March 14, 2019. CMS personnel visited the Hospital on March 26, 2019, and found that none of the corrective actions had been undertaken.

10.     On March 25, 2019, Sevier County, Lisa Moser, Ashley Knittig, and Chad Klitz sued DMCI, Jorge Perez, and Ricardo Perez in the Circuit Court of Sevier County, Arkansas, Case No. 67CV-19-16 (the "State Court Case").

11.     Thereafter, Sevier County sought the appointment of a state court receiver over DMCI itself, its operations, including the Hospital, as well as its assets in the State Court Case.

12.     At the time Sevier County sought the receivership, DMCI had threatened the stability of the Hospital and its ability to offer vital services by failing to, among other things:

    a.   Timely and fully pay DMCI's employees their wages and salaries as they become due;

    b.   Timely and fully pay physicians and providers;

    c.   Timely and fully pay taxes;

    d.   Timely and fully pay the claims of vendors;

    e.   Timely and fully pay basic utilities required to operate the Hospital;

    f.   Stock the Hospital with necessary supplies and medications;

    g.   Supply food for patients of the Hospital; and

    h.   Appropriately respond to CMS Notices of Deficiencies and undergo corrections as claimed in plans of correction.

13.     The Sevier County Circuit Court held a hearing on the Receivership request on March 28, 2019 (the "Receivership Hearing").

3

14.     At the Receivership Hearing, the Sevier County Circuit Court heard from multiple witnesses, some of whom were DMCI employees, who testified that DMCI had refused to fund employee wages, properly staff the Hospital with providers, and/or fund necessary utility expenses. Further, the Court heard testimony that the Hospital was in danger of losing its licensure and certification if immediate action was not taken.

15.     On March 28, 2019, the Sevier County Circuit Court entered an order appointing Rachel Matheson, RN (the "Receiver") as receiver over DMCI, its operations including the Hospital, and its assets (the "Receiver Order"). A copy of the Receiver Order is attached hereto as **Exhibit "A"**.

16.     Since her appointment, the Receiver has been working positively with CMS and ADH to undertake corrective actions to ensure the continued licensure and certification of DMCI.

17.     One of the affiliates that the Debtor lists in its Voluntary Petition is CAH Acquisition Company #12, LLC ("CAH Debtor"), an entity that recently filed a similar Chapter 11 case in the United States Bankruptcy Court for the Eastern District of North Carolina, Case No. 5:19-bk-01229 (the "CAH Case").[3] The CAH Case was dismissed pursuant to an Order Dismissing Case entered by the North Carolina bankruptcy court on March 29, 2019, a true and correct copy of which is attached hereto as **Exhibit "B"** and incorporated by reference herein.

## II. Argument

A.  *The Receiver Has Sole Standing To File Bankruptcy For The Debtor, DMCI.*

The Receiver Order enjoined the company's owners from transferring or expending any assets of DMCI without further court order and from taking any actions to interfere with the

---

[3] Debtor's petition also identifies nine other affiliates that filed bankruptcy cases in North Carolina, Tennessee and Kansas.  Under information and belief, all of the cases involve similar fact patterns as the case herein and the CAH Case.

continued operations of DMCI as a Critical Access Hospital under the direction of the Receiver. The Receiver does not consent to this bankruptcy case. To further clarify the Receiver's authority to operate DMCI, the Sevier County Circuit Court entered its Amended Temporary Restraining Order and Order Appointing Temporary Receiver" (the "Amended Order"), a true and correct copy of which is attached hereto as **Exhibit "C"** and incorporated by reference herein, on April 1, 2019.

The Amended Order grants the Receiver the sole and exclusive authority to remove any existing DMCI board members, managers, administrators and/or employees; identify and appoint qualified individuals to serve as board members, managers, administrators, and/or employees of DMCI; and "**the sole and exclusive authority to file and proceed with a voluntary bankruptcy petition in any United States Bankruptcy Court**." *See* Ex. C., ¶ 11 (emphasis added). On April 3, 2019, the Receiver exercised her authority to remove all directors from DMCI pursuant to the Amended Receivership Order. Rachel Matheson, RN, is, and has been since March 28, 2019, the party with the sole and exclusive authority to take any action on behalf of DMCI, including the authority to file a bankruptcy petition on behalf of DMCI.

As referenced above, the United States Bankruptcy Court for the Eastern District of North Carolina was recently asked to consider the same issue regarding one of Jorge Perez's other hospital bankruptcy filings. In the CAH Case, Fairfax Healthcare Authority, as receiver of that hospital, filed an Emergency Motion to Dismiss Chapter 11 Case, with Brief in Support ("Emergency Motion"), a true and correct copy of which is attached hereto as **Exhibit "D"** and incorporated by reference herein. The North Carolina bankruptcy court granted the Emergency Motion based on the debtor's lack of authority to file. *See* Ex. B.

In that case, various governmental entities in Fairfax, Oklahoma sought appointment of a state court receiver over the hospital, which was granted prior to the bankruptcy filing. In response

to Fairfax Healthcare Authority's Emergency Motion, the CAH Debtor filed its response ("CAH Response") and argued, *inter alia*, that the CAH Case should not be dismissed because Fairfax Healthcare Authority was a creditor of the CAH Debtor and that the Emergency Motion created a "creditor-driven intercorporate dispute."  The CAH Debtor then cited cases purportedly supporting its theory.[4]  Despite the CAH Debtor's attempt to avoid dismissal, the North Carolina court in the CAH Case acknowledged that Jorge Perez lacked authority to file based on the state court appointed receiver's sole and exclusive authority.

In our case, while Sevier County may technically be a creditor of DMCI, Sevier County is certainly not the typical creditor here.  Instead, Sevier County is a governmental unit that is acting to protect the safety and welfare of its citizens – citizens who are being denied access to lifesaving healthcare at the hands of Jorge Perez.  Moreover, the cases cited in Footnote 3 below have not been cited by courts in the Eighth and Eleventh Circuits.  In fact, the bankruptcy court in *In re Monroe Heights* even acknowledged that "the particular facts presented" should control the question of whether a bankruptcy case is dismissed, as opposed to "hard and fast rules on the question of a bankruptcy filing by a corporation for which a state receiver has been appointed."  *In re Monroe Heights Dev. Corp., Inc.*, 2017 WL 3701857, at *16-*18.

The United States Supreme Court also addressed the issue of bankruptcy filing authority as early as 1945.  In the case of *Price v. Gurney, et al.*, the Supreme Court stated that one must first determine whether those who filed a bankruptcy petition had the "authority to so act," which "authority finds its source in local law."  *Price v. Gurney, et al.*, 324 U.S. 100, 106 (1945).  Quite simply, if "those who purport to act on behalf of the corporation have not been granted authority

---

[4] The cases include *Citizens & N. Bank v. Monroe Heights Dev. Corp., Inc.* (*In re Monroe Heights Dev. Corp., Inc.*), Case No. 17-10176-TPA, 2017 WL 3701857 (Bankr. W.D. Pa., Aug. 22, 2017) and *In re Corporate & Leisure Event Prod., Inc.*, 351 B.R. 724 (Bankr. D. Ariz. 2006).

by local law to institute the proceedings, it has no alternative but to dismiss the petition." *Id.; see also Squire Court Partners Ltd. P'ship et al. v. Centerline Credit Enhanced Partners LP Series J* (*In re Squire Court Partners Ltd. P'ship*), 574 B.R. 701, 705-06 (E.D. Ark. 2017) (quoting *Price v. Gurney* for the same proposition).

The Amended Order made it clear that only the Receiver had the "the sole and exclusive authority to file and proceed with a voluntary bankruptcy petition in any United States Bankruptcy Court." *See* Ex. B., ¶ 11.  Accordingly, Jorge Perez was unauthorized to file this case and it therefore must be dismissed.

B.  *Because This Bankruptcy Is Filed In An Improper District, The Case Should Be Dismissed.*

Venue is governed by Section 1408 of Title 28, which provides:

A case under title 11 may be commenced in the district court for the district—in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district. . . .

28 U.S.C. § 1408 (West 2019).[5]  Thus, a debtor must have its principal place of business or principal assets in the district for at least 180 days prior to the commencement of the bankruptcy case.  Fed. R. Bankr. P. 1014(a)(2) provides that "[i]f a petition is filed in an improper district, the court, on the timely motion of a party in interest or on its own motion, and after a hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, may dismiss the case . . . ."

DMCI does not have any place of business, let alone a principal place of business, in

---

[5]  Venue is also appropriate "in the district court for the district in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership." 28 U.S.C. § 1408(2).  DMCI did not list or disclose any pending bankruptcy cases in this district concerning its affiliate, general partner, or partnership.

Florida.  Although Jorge Perez has listed a Miami address as DMCI's principal place of business, DMCI is an Arkansas domestic for-profit corporation.  On its voluntary petition, Jorge Perez notes that DMCI's principal assets are located at 1306 W. Collin Raye Drive, DeQueen, Arkansas 71832. Significantly, the petition does not indicate why the case was filed in this District when prompted. However, the petition does indicate that the Debtor owns or has possession of real property or personal property that needs immediate attention, stating "Debtor is a Hospital and has patients that require and receive medical services"[6] and providing DMCI's address in Arkansas. Because DMCI's principal place of business and principal assets are in Arkansas, this case should be dismissed.  Alternatively, Sevier County respectfully requests that this Court transfer the case to the United States Bankruptcy Court for the Western District of Arkansas, where all of the known assets and a large number of creditors are located.

### III. Local Rule 9075-1 Statement Regarding the Urgency of this Motion

Pursuant to Local Rule 9075-1, Sevier County requests a hearing on this Motion *on or before Thursday, April 11, 2019* because direct, immediate, and substantial harm will befall Sevier County and its residents if the Receiver is unable to return the Hospital to functioning status – and it is *this bankruptcy case* that is preventing her from doing so.

Sevier County is a very isolated, rural area. The official population of Sevier County is estimated to be 17,115 people, however, a very large percentage of the population living in the County is undocumented. The County population is 34% Hispanic or Latino, and the majority of the DeQueen School District is Hispanic or Latino. The County is also very impoverished – nearly 20% of residents live below the federal poverty line. The Hospital has been on "diversion" status, meaning the ambulance service will not take patients to the facility because of the lack of supplies

---

[6]  Although DMCI requires immediate attention as it relates to the referenced licensure issues, Mr. Perez misrepresents the fact that there are patients requiring and receiving medical services at this time.

for approximately seven weeks. The Hospital's emergency room has not had the necessary providers or supplies to see patients for approximately seven weeks. The situation on the ground at DMCI is dire. *Without a functioning hospital, the residents of Sevier County have no access to healthcare services within an hour's drive.*

The Receiver has had accommodations in place to pay utilities, meet the payroll obligation, fully supply the Hospital, and pay other necessary costs, but she cannot finalize those plans because of this bankruptcy case. If the Receiver is enjoined from acting because of this pending bankruptcy case, the Receiver will be unable to take corrective action to prevent the revocation of DMCI's licensure and certification by CMS and ADH. The Receiver has been notified by the ADH that CMS is in the process of reviewing its certification, and without immediate corrective action, DMCI's certification and licensure may be revoked immediately. Because the Hospital is located in an older building, DMCI is grandfathered-in to current licensure and is not required to meet more modern facility safety codes. If DMCI's licensure and certification are revoked, DMCI will be unable to reapply. If the Receiver is unable to take corrective action, DMCI will not remain in service as a Critical Access Hospital, which will certainly result in the absence of emergency services for all residents in Sevier County, Arkansas.

In order to ensure survival of DMCI, and due to Jorge Perez's absolute lack of authority to have filed bankruptcy in the first place, this case must be dismissed immediately. Pursuant to 11 U.S.C. § 543(a), the Receiver is continuing to engage in actions necessary to preserve the estate, including taking the steps necessary to complete a corrective action plan to provide to ADH and CMS in order to keep DMCI's status active.[7] If this Court does not dismiss the bankruptcy case,

---

[7]  The Court should take note that the Debtor and Mr. Perez have done nothing to notify this Court of the dire circumstances facing the Hospital and the residents of Sevier County. Other than a bare-bones petition and list of the Debtor's twenty largest creditors, there is nothing in the Debtor's filings to date to inform this Court of the existential threat posed to the Hospital arising from the imminent revocation of it license and certifications by CMS and other

Sevier County alternatively requests that this Court grant the Receiver authority to continue her efforts to take corrective action to prevent the revocation of DMCI's licensure and certification by CMS and ADH.

Counsel for Sevier County has exchanged emails and attempted to reach DMCI's counsel by telephone in an attempt to resolve this matter without a hearing and those discussions will be ongoing.

WHEREFORE, Sevier County requests that this Court grant its Motion and dismiss the bankruptcy case filed on behalf of DMCI.

Dated:  April 8, 2019.                          Respectfully submitted,

**HOLLAND & KNIGHT LLP**
*Counsel for Sevier County*
701 Brickell Avenue, 33rd Floor
Miami, Florida 33131
Telephone: (305) 374-8500
Facsimile:  (305) 789-7799
E-mail: jose.casal@hklaw.com
E-mail: joaquin.alemany@hklaw.com
E-mail: robert.davis@hklaw.com

By: /s/ Robert W. Davis, Jr.
        Jose A. Casal
        Florida Bar No. 767522
        Joaquin J. Alemany
        Florida Bar No. 662380
        Robert W. Davis, Jr.
        Florida Bar No. 84953

---

health care regulators.  Candidly, it shocks the conscience that a so-called health care provider can be so cavalier and negligent in carrying out its duty to the public.

## <u>CERTIFICATES OF SERVICE AND COMPLIANCE WITH LOCAL RULE 9073-1(D)</u>

      I HEREBY CERTIFY that counsel for Sevier County has exchanged emails and attempted to reach DMCI's counsel by telephone in an attempt to resolve this matter without a hearing and those discussions will be ongoing.

      I FURTHER CERTIFY that on this 8th day of April, 2019, a true and correct copy of the foregoing was served via electronic transmission on all CM/ECF registered users for this case, as indicated on the service list below:

- **Paul Decailly**   pdecailly@dlg4me.com, ecf@dlg4me.com, kristin@dlg4me.com
- **Office of the US Trustee**   USTPRegion21.MM.ECF@usdoj.gov


                By: /s/ Robert W. Davis, Jr.
                      Robert W. Davis, Jr.

## IN THE CIRCUIT COURT OF SEVIER COUNTY, ARKANSAS

**SEVIER COUNTY OF THE**
**STATE OF ARKANSAS,**
**LISA MOSER, ASHLEY KNITTIG**
**& CHAD KLITZ**                                               **PLAINTIFFS**

**VS.**                        **NO.:     67CV-19-16**

**DEQUEEN MEDICAL CENTER, INC.,**
**JORGE PEREZ & RICARDO PEREZ**                            **DEFENDANTS**

## TEMPORARY RESTRAINING ORDER
## AND ORDER APPOINTING TEMPORARY RECEIVER

On March 28, 2019, came on for hearing the request of the plaintiffs, Sevier County of

the State of Arkansas, Lisa Moser, Ashley Knittig and Chad Klitz, for an *ex parte* temporary

restraining order against DeQueen Medical Center, Inc. ("DMCI"), Jorge Perez and Ricardo

Perez and for a receiver to be appointed for DMCI, and from the proof presented, the Court

hereby finds and concludes as follows:

1. DMCI is a corporation organized under the laws of the State of Arkansas with its

principal place of business in DeQueen, Sevier County, Arkansas.  DMCI operates as a licensed

hospital in DeQueen, and its emergency room provides the only emergency services within an

hour's drive of many locations in Sevier County.  The continued operation of DMCI is of vital

importance to the health and welfare of the citizens of Sevier County.

2. The Circuit Court of Sevier County, Arkansas has subject matter jurisdiction in this

matter.

*Page 1 of 5*

Exhibit "A"

3. Venue is proper in Sevier County, Arkansas pursuant to Ark. Code Ann. § 16-55-213.

4. DMCI is insolvent and is unable to pay its debts as they become due. Employees of DMCI have either been laid off or have quit their employment because they have not been paid. Further, healthcare professionals essential to the operation of the DMCI and to continued licensure of the hospital have discontinued providing medical services.

5. DMCI has received notice of violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA") and various CMS regulations by the Arkansas Department of Health ("ADH") that must be corrected pursuant to an approved corrective action plan submitted by March 29, 2019.

6. DMCI submitted a corrective action plan to ADH that was found to be non-compliant. As a result, ADH has indicated that it will revoke the licensure of DMCI unless control of the hospital is removed from the Defendants.

7. The continued operation of DMCI is threatened unless a receiver is appointed to marshal the assets of DMCI and use them to maintain DMCI's services and to correct its regulatory deficiencies so limited licensure with the State of Arkansas can be maintained.

8. DMCI could qualify and remain licensed for the limited purpose of serving as an Emergency Services Facility if a qualified receiver is appointed.

9. Pursuant to Rule 66 of the Arkansas Rules of Civil Procedure, the Court has authority to appoint a receiver for DMCI for any lawful purpose when the appointment is necessary and proper. In addition, Ark. Code Ann. § 16-117-207 provides for the appointment of a receiver at the request of a creditor to preserve property that is the subject of the creditor's claim. For the reasons set forth herein above, cause exists for the appointment of a receiver of DMCI to

*Page 2 of 5*

continue the limited operations of the hospital as an Emergency Services Facility and manage its assets and business for such purpose.

10.  The Court finds that Rachel Matheson, RN, is qualified and willing to serve as the receiver for DMCI to continue operations as an Emergency Services Facility.

11.  The Court appoints Rachel Matheson, RN, to serve as the receiver (the "Receiver") for DMCI to continue operations as an Emergency Services Facility.   Said Receiver shall have the authority that includes, but is not limited to the following:

(a)    Marshal the assets of DMCI including, but not limited to identifying and taking control of any existing bank accounts;

(b)    Open a new bank account from which she can transact business on behalf of DMCI;

(c)    Provide a copy of this Order to third party payors providing notice that the payors are to deal exclusively with the Receiver on all pending and future claims for reimbursement submitted by DMCI;

(d)    Provide a copy of this Order to ADH and the Centers for Medicare and Medicaid Services ("CMS") confirming that the Receiver has sole and exclusive authority in matters of license and certifications for DMCI to serve as an Emergency Services Facility;

(e)    Enter into contracts and/or agreements with vendors, suppliers and employees as necessary and appropriate for DMCI to serve as an Emergency Services Facility;

(f)    Take all such other actions as necessary and appropriate to preserve, maintain and operate DMCI as an Emergency Services Facility; and

(g)    Have such powers and duties as otherwise authorized by Arkansas Rule of Civil

Procedure 66 or subsequent orders of this Court.

All such actions of the Receiver are subject to continued Court supervision and further order

from the Court.

12.  Rachel Matheson, RN, shall not be required to post a bond to serve as Receiver.

13.  In her capacity as Receiver, Rachel Matheson, RN, shall provide reports to this

Court as specified in Arkansas Rule of Civil Procedure 66(b) or as otherwise directed by

subsequent orders of this Court.

14.  There is a real and present danger that the assets of DMCI are being dissipated and

not used for providing the DMCI's essential medical services, including payment of employees

and healthcare professionals.  The continued dissipation of assets will jeopardize not only the

ability of DMCI to continue to operate as a licensed medical provider, but will also endanger the

health and welfare of the citizens of Sevier County who are dependent upon its services.

15.  The Plaintiffs have no adequate remedy at law to prevent the continued

mismanagement of DMCI and the dissipation of assets and medical services and the potential

loss of the DMCI's ability to serve as a medical provider to Sevier County, which will result in

irreparable harm absent the granting of injunctive relief and the appointment of a receiver.

16.  It is in the public interest for the Defendants to be enjoined from further dissipation

of DMCI's assets and mismanagement of its operations.  The Defendants will not be unduly

prejudiced by the entry of a temporary restraining order against them that prohibits the transfer

or expenditure of assets belonging to DMCI and the balance of any harm weighs in favor of

granting the requested relief.

17.   A temporary restraining order is hereby entered which:  *(a)* enjoins each of the Defendants from transferring or expending any assets of DMCI without further court order; and *(b)* enjoins the Defendants from taking any actions to interfere with the continued operations of DMCI as an Emergency Services Facility under the direction of the Receiver.

18.   Because of the potential fraudulent mismanagement of DMCI assets and the potential imminent loss of licensed status for the hospital, this Court finds that it is appropriate to enter this temporary restraining order on an *ex parte* basis.

19.   A copy of this order shall be served upon the defendants or their registered agents for service of process by electronic mail and overnight delivery service.

20.   Pursuant to Ark. R. Civ. P. 65(b)(2), the Court will hold a hearing as to whether to continue the temporary relief granted by this order at _10_ a.m./~~p.m.~~ on the _19_ day of _April_ 2019 at the Sevier County Courthouse in DeQueen, Arkansas.

**IT IS SO ORDERED** this _28_ day of March, 2019 at _11:15_ a.m./~~p.m.~~

_____

HON. TOM COOPER

DATE: _3-28-19_ _____

ORDER PREPARED BY:

Bruce B. Tidwell, AR Bar No. 96115
E-Mail – btidwell@fridayfirm.com
Direct Phone – (501) 370-1496

FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Ave., Suite 2000
Little Rock, AR 72201-3493
Phone - (501) 376-2011
Fax -  (501) 376-2147

*Attorneys for the Plaintiffs*

*Page 5 of 5*

**SO ORDERED.**

**SIGNED this 29 day of March, 2019.**

Joseph N. Callaway

**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

IN RE:

                                          **CASE NO.**

**CAH ACQUISITION COMPANY 12, LLC**        **19-01229-5-JNC**
**d/b/a FAIRFAX COMMUNITY HOSPITAL**    **CHAPTER 11**

            **DEBTOR**

### ORDER DISMISSING CASE

      The matter before the court is the motion to dismiss this chapter 11 case filed by Fairfax Healthcare Authority, the receiver appointed for CAH Acquisition Company 12, LLC d/b/a Fairfax Hospital by the District Court of Osage County, Oklahoma, D.E. 22. A hearing took place in Greenville, North Carolina on March 28, 2019.

      CAH Acquisition Company 12, LLC d/b/a Fairfax Hospital filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on March 17, 2019, and Thomas W. Waldrep, Jr. (the "Trustee") was appointed interim trustee by order dated March 18, 2019. Fairfax Heathcare Authority filed its motion to dismiss on March 22, 2019, contending that the Debtor did not have authority to file the bankruptcy petition.

      For the reasons stated on the record from the bench, the motion to dismiss is ALLOWED. The Trustee is authorized to retain the sum of $10,000 from funds on hand pending further orders of this court, and is directed to turn over all other funds on hand to Fairfax Heathcare Authority. The Trustee may, within 14 days of the date of this order, file a motion for recovery of fees pursuant to 11 U.S.C. § 349(b)(3).

### END OF DOCUMENT

**Exhibit "B"**

ELECTRONICALLY FILED
Sevier County Circuit Court
Kathy Smith, Circuit Clerk
2019-Apr-01  16:01:21
67CV-19-16
C09WD01 : 6 Pages

## IN THE CIRCUIT COURT OF SEVIER COUNTY, ARKANSAS

**SEVIER COUNTY OF THE**
**STATE OF ARKANSAS,**
**LISA MOSER, ASHLEY KNITTIG**
**& CHAD KLITZ**                                                                 **PLAINTIFFS**

**VS.**                            **NO.:**    **67CV-19-16**

**DEQUEEN MEDICAL CENTER, INC.,**
**JORGE PEREZ & RICARDO PEREZ**                                **DEFENDANTS**

### *AMENDED* TEMPORARY RESTRAINING ORDER
### AND ORDER APPOINTING TEMPORARY RECEIVER

On March 28, 2019, came on for hearing the request of the plaintiffs, Sevier County of the State of Arkansas, Lisa Moser, Ashley Knittig and Chad Klitz, for an *ex parte* temporary restraining order against DeQueen Medical Center, Inc. ("DMCI"), Jorge Perez and Ricardo Perez and for a receiver to be appointed for DMCI, and from the proof presented *at the hearing and the additional information presented in the Motion to Amend TRO filed on April 1, 2019*, the Court hereby finds and concludes as follows:

1. DMCI is a corporation organized under the laws of the State of Arkansas with its principal place of business in DeQueen, Sevier County, Arkansas.  DMCI operates as a licensed hospital in DeQueen, and its emergency room provides the only emergency services within an hour's drive of many locations in Sevier County.  The continued operation of DMCI is of vital importance to the health and welfare of the citizens of Sevier County.

**Exhibit "C"**

2. The Circuit Court of Sevier County, Arkansas has subject matter jurisdiction in this matter.

3. Venue is proper in Sevier County, Arkansas pursuant to Ark. Code Ann. § 16-55-213.

4. DMCI is insolvent and is unable to pay its debts as they become due. Employees of DMCI have either been laid off or have quit their employment because they have not been paid. Further, healthcare professionals essential to the operation of the DMCI and to continued licensure of the hospital have discontinued providing medical services.

5. DMCI has received notice of violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA") and various CMS regulations by the Arkansas Department of Health ("ADH") that must be corrected pursuant to an approved corrective action plan submitted by March 29, 2019.

6. DMCI submitted a corrective action plan to ADH that was found to be non-compliant. As a result, ADH has indicated that it will revoke the licensure of DMCI unless control of the hospital is removed from the Defendants.

7. The continued operation of DMCI is threatened unless a receiver is appointed to marshal the assets of DMCI and use them to maintain DMCI's services and to correct its regulatory deficiencies so limited licensure with the State of Arkansas can be maintained.

8. DMCI could qualify and remain licensed *as a Critical Access Hospital* if a qualified receiver is appointed.

9. Pursuant to Rule 66 of the Arkansas Rules of Civil Procedure, the Court has authority to appoint a receiver for DMCI for any lawful purpose when the appointment is necessary and proper. In addition, Ark. Code Ann. § 16-117-207 provides for the appointment of a receiver at the request of a creditor to preserve property that is the subject of the creditor's claim. For the

reasons set forth herein above, cause exists for the appointment of a receiver of DMCI to continue the operations of *DMCI as a Critical Access Hospital* and manage its assets and business for such purpose.

10.  The Court finds that Rachel Matheson, RN, is qualified and willing to serve as the receiver for DMCI to continue operations as *a Critical Access Hospital*.

11.  The Court appoints Rachel Matheson, RN, to serve as the receiver (the "Receiver") for DMCI to continue operations as *a Critical Access Hospital*.  Said Receiver shall have the authority that includes, but is not limited to the following:

*(a)*    Marshal the assets of DMCI including, but not limited to identifying and taking control of any existing bank accounts;

*(b)*    Open a new bank account from which she can transact business on behalf of DMCI;

*(c)*    Provide a copy of this Order to third party payors providing notice that the payors are to deal exclusively with the Receiver on all pending and future claims for reimbursement submitted by DMCI;

*(d)*    Provide a copy of this Order to ADH and the Centers for Medicare and Medicaid Services ("CMS") confirming that the Receiver has sole and exclusive authority in matters of license and certifications for DMCI to serve as *a Critical Access Hospital*;

*(e)*    Enter into contracts and/or agreements with vendors, suppliers and employees as necessary and appropriate for DMCI to serve as *a Critical Access Hospital*;

*(f)*    Take all such other actions as necessary and appropriate to preserve, maintain and operate DMCI as *a Critical Access Hospital*;

(g)     Have such powers and duties as otherwise authorized by Arkansas Rule of Civil Procedure 66 or subsequent orders of this Court.

(h)     *Remove existing DMCI board members, managers, administrators and/or employees.*

(i)     *Identify and appoint qualified individuals to serve as board members, managers, administrators and/or employees of DMCI.*

(j)     *Revise and recommend for approval governing documents for DMCI, including, but not limited to, corporate bylaws.*

(k)     *Revise and recommend for approval operational documents for DMCI, including, but not limited to, medical staff bylaws and certain policies and procedures.*

(l)     *Engage consultants as deemed reasonable and necessary to assist with the licensure and certifications issues, as well as other operational issues.*

(m)     *Have sole and exclusive authority to file and proceed with a voluntary bankruptcy petition in any United States Bankruptcy Court.*

All such actions of the Receiver are subject to continued Court supervision and further order from the Court.

12.     Rachel Matheson, RN, shall not be required to post a bond to serve as Receiver. *Further, by acting in her capacity as Receiver, she is acting for and on behalf of DMCI without recourse or liability to Rachel Matheson, RN, personally.*

13.     In her capacity as Receiver, Rachel Matheson, RN, shall provide reports to this Court as specified in Arkansas Rule of Civil Procedure 66(b) or as otherwise directed by subsequent orders of this Court.

14.   There is a real and present danger that the assets of DMCI are being dissipated and not used for providing the DMCI's essential medical services, including payment of employees and healthcare professionals.  The continued dissipation of assets will jeopardize not only the ability of DMCI to continue to operate as a licensed medical provider, but will also endanger the health and welfare of the citizens of Sevier County who are dependent upon its services.

15.  The Plaintiffs have no adequate remedy at law to prevent the continued mismanagement of DMCI and the dissipation of assets and medical services and the potential loss of the DMCI's ability to serve as a medical provider to Sevier County, which will result in irreparable harm absent the granting of injunctive relief and the appointment of a receiver.

16.   It is in the public interest for the Defendants to be enjoined from further dissipation of DMCI's assets and mismanagement of its operations.  The Defendants will not be unduly prejudiced by the entry of a temporary restraining order against them that prohibits the transfer or expenditure of assets belonging to DMCI and the balance of any harm weighs in favor of granting the requested relief.

17.   A temporary restraining order is hereby entered which:  *(a)* enjoins each of the Defendants from transferring or expending any assets of DMCI without further court order; and *(b)* enjoins the Defendants from taking any actions to interfere with the continued operations of DMCI as *a Critical Access Hospital* under the direction of the Receiver.

18.    Because of the potential fraudulent mismanagement of DMCI assets and the potential imminent loss of licensed status for the hospital, this Court finds that it is appropriate to enter this temporary restraining order on an *ex parte* basis.

19.    A copy of this order shall be served upon the defendants or their registered agents for service of process by electronic mail and overnight delivery service.

20.     Pursuant to Ark. R. Civ. P. 65(b)(2), the Court will hold a hearing as to whether to continue the temporary relief granted by this order at **10:00 a.m.** on the **19th** day of **April, 2019** at the Sevier County Courthouse in DeQueen, Arkansas.   *Additional time is provided prior to the hearing on the 19th to allow for proper service on the Defendants.*

        **IT IS SO ORDERED** this _____1st_____ day of April, 2019 at ____3_____ a.m./p.m.

_____
**HON. TOM COOPER**


DATE: _____4/1/19_____

<u>ORDER PREPARED BY</u>:

Bruce B. Tidwell, AR Bar No. 96115
E-Mail – btidwell@fridayfirm.com
Direct Phone – (501) 370-1496

FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Ave., Suite 2000
Little Rock, AR 72201-3493
Phone - (501) 376-2011
Fax -  (501) 376-2147

*Attorneys for the Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

In Re:

CAH ACQUISITION COMPANY 12, LLC          Case No. 19-01229-5-JNC
d/b/a Fairfax Community Hospital,         Chapter 11

                                Debtor.

**EMERGENCY MOTION TO DISMISS CHAPTER 11 CASE,**
**WITH BRIEF IN SUPPORT**

Fairfax Healthcare Authority, the duly appointed Receiver for the putative Debtor, requests

that the Court immediately dismiss this proceeding pursuant to 11 U.S.C. § 1112(b), for the reasons

stated below.

**FACTS**

1.      Jorge Perez filed a voluntary Chapter 11 petition on behalf of CAH Acquisition

Company 12, LLC ("CAH 12") on Sunday, March 17, 2019.

2.      CAH 12's sole business is the ownership and operation of the Fairfax Community

Hospital located in rural Fairfax, Oklahoma (the "Fairfax Hospital").

3.      The Fairfax Hospital provides the City of Fairfax and surrounding areas with

essential health care services, including diagnostic and therapeutic services; 24-hour emergency

care; convenient and specialized outpatient resources; laboratory, physical rehabilitation, acute

care, swing bed, cardiology, and other services.

4.      CAH 12 is owned 80% by Health Acquisition Company, LLC and 20% by

HMC/CAH Consolidated, Inc.

1

**Exhibit "D"**

5.     Health Acquisition Company, LLC is a West Virginia limited liability company with its principal office in West Virginia; its members are as follows:

> Jorge Perez — domiciled in Florida
> Ricardo Perez — domiciled in Florida
> Carlos Perez - domiciled in Florida
> Steven F. White - domiciled in West Virginia
> Catherine White - domiciled in West Virginia
> Paul L. Nusbaum - domiciled in West Virginia
> Harriett F. Nusbaum - domiciled in West Virginia

See, *Disclosure Statement Identifying Constituents of LLC or Partnership of Health Acquisition Company 7, LLC*, filed in the United States District Court for the Western District of Oklahoma on February 1, 2019, Case No CIV-19-89-G, **Exhibit 1.**

***Receivership of CAH 12.***

6.     CAH 12 engaged Empower H.M.S., LLC ("Empower"), a company owned in part by Jorge Perez, to manage and operate Fairfax Hospital.

7.     Empower is a Delaware limited liability company with members in Florida. The members of Empower are as follows:

> Jorge Perez – domiciled in Florida
> Ricardo Perez – domiciled in Florida
> Carlos Perez - domiciled in Florida

See, *Disclosure Stated Identifying Constituents of LLC or Partnership of Empower H.M.S.*, filed in the United States District Court for the Western District of Oklahoma on February 1, 2019, Case No CIV-19-89-G, **Exhibit 2.**

8.     On December 13, 2018, the Town of Fairfax, the Fairfax Public Works Authority, and the Town of Fairfax Board of Control (collectively "Fairfax") sued CAH 12 and others in the District Court of Osage County, Oklahoma, Case No. CJ-2018-232 (the "State Court Case").

2

9.       Thereafter, Fairfax sought the appointment of a state court receiver over CAH 12 itself, its operations, as well as its assets in the State Court Case.

10.     At the time Fairfax sought the receiver, CAH 12 had threatened the stability of the Hospital and its ability to be maintained as a going concern by failing to, among other things:

(a)  timely and fully pay the Fairfax Hospital's employees their wages and salaries as they become due;

(b)  timely and fully pay the vendors' claims;

(c)  timely and fully pay for basic utilities required to operate the Fairfax Hospital;

(d)  stock the Fairfax Hospital with necessary supplies and medications; and

(e)  supply food for patients since December 2018.

11.     The Osage County District Court held a hearing on the Receivership request on February 27, 2019 (the "Receivership Hearing").

12.     At that time, the Osage County District Court heard from multiple witnesses who are employees of the Fairfax Hospital, who testified that CAH 12 and Empower had abandoned the Fairfax Hospital, and refused to fund employee wages, properly supply the hospital, or purchase food for the patients.

13.     Even as of the filing of this Motion, Fairfax has been required to pay the hospital's electricity and gas bills to ensure that services are not shut off and to pay vendors of CAH 12 to obtain necessary supplies for the Fairfax Hospital.

14.     On February 27, 2019, the Osage County District Court appointed Fairfax Healthcare Authority (the "Receiver") as receiver over CAH 12, its operations, and its assets (the "Receiver Order"). A copy of the Receiver Order is attached hereto as **Exhibit 3**.

15.     The Receiver filed its Receiver's Bond and its Receiver's Oath on March 4, 2019.

A copy of the Receiver's Bond and the Receiver's Oath is attached as **Exhibit 4**.

*The Receiver's Sole Standing to file Bankruptcy for the Debtor*

16.     The Receiver Order vested the Receiver with the authority to file a bankruptcy petition on behalf of CAH 12, and enjoined the company's owners and officers from any action inconsistent with that authority.  The Receiver does not consent to this bankruptcy case.

17.     To that end, Paragraph 31 of the Receiver Order states as follows:

> 31.  The Receiver is empowered to file a voluntary petition for relief pursuant to 11 U.S.C. §101 *et seq*. For CAH 12 if such is deemed appropriate in the sole discretion of the Receiver in the exercise of his business judgment.  The Defendants' officers, directors, managers, members and or shareholders are specifically and joined from taking any action inconsistent with the terms of this Order and from authorizing any action by the Defendants inconsistent with the by-laws or Operating Agreement as of the date as of the entry of this Order.

(**Exhibit 3** at ¶31; emphasis added.)

18.     The Receiver Order further declared that, "[u]pon and after entry of this Order, Defendants are enjoined from doing anything that would disrupt, impair adversely affect, or otherwise complicate the smooth and orderly transition of CAH 12, the CAH 12 Assets, the Other Property, and control of the Hospital's operations to the Receiver, or continued and ongoing operations of the Hospital by the Receiver, as contemplated by this Order." (**Exhibit 3** at ¶8.)

19.     To clarify the Receiver's sole authority over the company's bankruptcy even further, on March 8, 2019, the Osage County District Court entered the Amendment to Order Appointing Receiver (the "Amendment to Receivership Order").  A copy of the Amendment to Receivership Order is attached hereto as **Exhibit 5**.

20.     Paragraphs one and three of the Amendment to Receivership Order state:

1. The Fairfax Healthcare Authority **(the "Receiver"), and no one else, shall be vested with the sole and exclusive power and authority to file** and maintain a

4

voluntary bankruptcy petition under the United States Bankruptcy Code, Title 11 U.S.C. § 101, et seq. (emphasis added)

\*\*\*\*\*

3.  The Receiver shall have the **sole power and authority**, consistent with the terms of the Court's February 27, 2019 Order Appointing Receiver, (i) to oversee and make all final decisions concerning the litigation relating to CAH 12[1], the CAH 12 Assets and the Other Property, including but not limited to entry of litigation settlements and consent judgement, (ii) **to remove any existing managers**, and identify and appoint qualified individuals to serve as manager of CAH 12. (iii) analyze, market and sell any or all of the CAH 12 Assets or Other Property, and (iv) manage and operate CAH 12 on a daily basis. (foot note omitted)

21.  On March 13, 2019, the Receiver filed its Notice of Action by Receiver (Removal of Managers) whereby the Receiver officially removed all managers from Debtor's pursuant to the Amendment to Receivership Order. A copy of the Notice of Action is attached as **Exhibit 6**.

***Perez did not have corporate authority to file bankruptcy for Debtor***

22.  On the "Corporate Ownership Statement (Rule 7007.1)" found at page 12 of 12 of the Voluntary Petition, the putative debtor responded "None" to the question of whether any company owned 10% or more of CAH 12.

23.  Jorge Perez, who signed the Voluntary Petition and Verification of Creditor Matrix as "Board Chairman" of CAH 12, knew this representation is incorrect.

24.  It is likely that Jorge Perez misrepresented this fact to the attorney who signed the Corporate Ownership Statement.

25.  Gregory G. Swartz is, and has been since September 4, 2018, the President and sole member of the Board of Directors of HMC/CAH Consolidated, Inc., which is one of the ***two*** Members of CAH 12. Affidavit of Gregory G. Swartz, **Exhibit 7**, ¶¶ 1, 2.

26.     CAH 12's corporate management and powers are controlled by its Second Amended and Restated Limited Liability Company Agreement (the "Agreement").  Affidavit of Gregory G. Swartz, **Exhibit 7**, ¶¶ 3, 4.

27.     A true and correct copy of the Agreement is attached to the Affidavit of Mr. Swartz.  Affidavit of Gregory G. Swartz, **Exhibit 7**, ¶ 3.

28.     Jorge Perez signed the Agreement as CEO of Heath Acquisition Company, LLC, and therefore knew CAH 12's Corporate Ownership Statement is false.  See, Agreement, attached to the Affidavit of Gregory G. Swartz, **Exhibit 7**, at pg. 13.

29.     Paragraph 4.1(f), found at pages six and seven of the Agreement, states in relevant part:

> Notwithstanding any provision of this agreement to the contrary, the Company shall not take enter, approve, cause, consent or permit the Company to take any of the following actions **without the prior unanimous written consent of the Members**:
>
> ****
>
> (f)     initiate a proceeding for the bankruptcy of the Company;

Affidavit of Gregory G. Swartz, **Exhibit 7**, ¶¶ 3, and Agreement attached thereto, pp. 6-7 (emphasis added).

30.     HMC/CAH Consolidated, Inc., a Member and 20% owner of CAH 12, has never given written consent for the filing of this bankruptcy case on behalf of CAH 12. Affidavit of Gregory G. Swartz, **Exhibit 7**, ¶¶ 6-10.

31.     Jorge Perez knew he did not have corporate authority to file this bankruptcy case, which is likely why CAH 12's Corporate Ownership Statement is incorrect.

*Urgency of this Motion*

32.   At this point, the employees of Fairfax Hospital have not been paid in approximately seven weeks.  They have stayed out of a deep sense of loyalty and duty to their neighbors and community.

33.   The next payroll is due to the Fairfax Hospital employees on Friday, March 29, 2019.  The employees have stayed and worked without pay for almost two months out of loyalty and love for their community.  However, if the employees are not paid at that time, they will be forced to leave the Hospital for gainful employment.

34.   The Fairfax Hospital has been on "divert status," meaning the ambulance service will not take patients to the facility because of the lack of supplies, for approximately six weeks.

35.   Even basic utility bills have gone unpaid for months.

36.   The purported Chapter 11 Trustee has not sought any first day financing motions, and has given no indication there is money to operate any of the CAH Hospitals, much less CAH 12.  In fact, the Chapter 11 Trustee has stated to counsel for the Town of Fairfax that he only has $14,000.00, while the upcoming payroll alone is close to $150,000.00.

37.   The situation on the ground at Fairfax Hospital is dire.

38.   The Receiver has had accommodations in place to pay utilities, meet the payroll obligation, fully supply Fairfax Hospital, and pay other necessary costs, but it cannot finalize those plans because of CAH 12's North Carolina bankruptcy case.

39.   In order to ensure survival of the Fairfax Hospital, and due to the absolute lack of authority to have filed bankruptcy in the first place, this case must be dismissed immediately.

## ARGUMENT AND AUTHORITIES

## PROPOSITION I

## THE FILING OF CAH 12'S BANKRUPTCY PETITION WAS NOT AUTHORIZED UNDER OKLAHOMA LAW AND THUS, THE PETITION SHOULD BE DISMISSED.

If a Court finds that those who purport to act on behalf of a corporate entity have not been granted authority by local law to institute bankruptcy proceedings, it has no alternative but to dismiss the bankruptcy petition. *Price v. Gurney*, 324 U.S. 100, 106, 65 S. Ct. 513, 516, 89 L. Ed. 776 (1945). "State law includes the decisions of state courts." *In re Licores,* 2013 WL 6834609, at *5 (C.D. Cal. Dec. 20, 2013) (*citing Tenneco West, Inc. v. Marathon Oil Co.*, 756 F.2d 769, 771 (9th Cir.1985).

In the case of *In re Licores,* 2013 WL 6834609, (C.D. Cal. Dec. 20, 2013), a corporation was placed under a state court receivership prior to bankruptcy. The receivership order vested the state court receiver with the sole authority to file a bankruptcy petition for the company. Notwithstanding that order, owners of the company filed a voluntary chapter 11 bankruptcy petition for the company. Seven days after the filing, the receiver filed an emergency motion to dismiss the chapter 11, arguing that the owners did not have authority to file the case in light of the receivership order. The bankruptcy court dismissed the chapter 11 case finding "[d]ebtor lacked authorization to file bankruptcy in view of the vesting in the [r]eceiver the exclusive authority to file." *Id.* at *1. The owners appealed the dismissal to the U. S. District Court for the Central District of California, arguing that the state court lacked authority to enter an order preventing corporate directors from filing bankruptcy for the company. *In re Licores, 2*013 WL 6834609, at *5.

8

The district court, however, affirmed the bankruptcy's dismissal. *Id. at \*8*. The reviewing court reasoned that while state courts cannot deny a corporation the right to file bankruptcy, state law, through a receivership order, had full authority "to identif[y] *who* has the power to file the bankruptcy petition on behalf of the Debtor." *Id. at \*6*. The district court aptly stated:

> As the Supreme Court stated in Price, "nowhere is there any indication that Congress bestowed on the bankruptcy court jurisdiction to determine that those who in fact do not have the authority to speak for the corporation as a matter of local law are entitled to be given such authority and therefore should be empowered to file a petition on behalf of the corporation." Price, 324 U.S. at 107. Thus, the Receivership Order does not run contrary to Congress's right to enact uniform laws of bankruptcy or change the application of bankruptcy laws to debtors.

Thus the *In re Licores* court ruled that because the state court receivership order did not preclude company from filing bankruptcy, and because the order vested the receiver with the exclusive ability to file on behalf of the debtor company, the bankruptcy case was properly dismissed as being filed without requisite authority. *Accord, Chitex Commc'n, Inc. v. Kramer,* 168 B.R. 587, 589–91 (S.D.Tex.1994) (in a divorce proceeding, the district court affirmed the bankruptcy court's dismissal of a chapter 11 case filed by the corporation's president, holding that the power to file bankruptcy had been vested exclusively in the state court receiver.)

The Ninth Circuit very recently addressed this issue in *In re Sino Clean Energy, Inc.*, 901 F.3d 1139 (2018). In that case, a state court entered an order that appointed a receiver over the company and gave him the power to remove the company's board of directors, which he did. After removal of the board, the former board members filed a chapter 11 bankruptcy for the company. In dismissing the case, the bankruptcy court held that the former directors "filed without corporate authority" because they "had been replaced by the Receiver" prior to the filing. *Id*. at 1141.The district court affirmed. *Id.*

9

Looking to Nevada corporate law, the Ninth Circuit held that only current directors had authority to file bankruptcy; because the directors had been removed under the receivership order, they therefore had no authority to file the bankruptcy case. *In re Sino Clean Energy, Inc.,* 901 F.3d at 1142. Like the *In re Licores,* court above, the appellate court cited *Price v. Gurney*, 324 U.S. 100, 106–07, 65 S.Ct. 513, 89 L.Ed. 776 (1945) for the proposition that "State law determines who has the authority to file a voluntary bankruptcy petition on behalf of a debtor." *Id.* at 1141. The Ninth Circuit made clear that "Nevada state law ***includes the decision of its state courts***." *Id.* (emphasis added)(citing *Tenneco W., Inc. v. Marathon Oil Co.*, 756 F.2d 769, 771 (9th Cir. 1985).

In the present case, the District Court of Osage County, Oklahoma had, and exercised, the power to determine, not whether CAH 12 could *file* bankruptcy, but rather who could *authorize* a bankruptcy for the company. That court's decision was to grant the Receiver the sole and exclusive right to file bankruptcy on behalf of CAH 12. See, **Exhibit 3** and **Exhibit 5**. And that Osage County State Court decision is binding as "state law" just as would be a statute regarding the issue. Clearly, Perez had no authority to file the current bankruptcy case, and the case must be dismissed for that reason.

Moreover, not only did the Oklahoma state court grant the Receiver sole authority to file bankruptcy, it also granted the receiver the ability remove CAH 12's existing managers. On March 13, 2019, the Receiver did remove all then-existing managers of CAH 12. *See*, **Exhibit 6**. Therefore, based on Oklahoma state law the Receiver was vested with the sole authority to file bankruptcy for CAH 12 and the former managers of CAH 12 were stripped of any powers to act on behalf of CAH 12 upon their removal. Clearly, Jorge Perez lacked authority to file the current bankruptcy case, and as a consequence the case must be dismissed.

10

## PROPOSITION II

## THE PETITION SHOULD BE DISMISSED BECAUSE THE FILING WAS NOT AUTHORIZED UNDER CAH 12's OPERATING AGREEMENT

Even if the Debtor could overcome the uncontroverted fact that the Receiver was vested with the sole authority to file bankruptcy, and that CAH 12's previous managers were removed by the Receiver, Jorge Perez still lacked authority to file the instant bankruptcy. Under CAH 12's operating agreement, prior unanimous written consent of both its Members is an express precondition to the authorization of a bankruptcy for CAH 12. Jorge Perez signed the operating agreement and, therefore, knew of this prerequisite, but did not obtain such consent. This is likely why he told his attorney to check "None" on CAH 12's Corporate Ownership Statement.

A bankruptcy filing for an entity must be duly authorized by that entity. A bankruptcy filed by an entity without proper authority **must** be dismissed upon timely objection. *Hager v. Gibson,* 108 F3d 35, 39 (4th Cir. 1997); see also *In re Audubon Quartet, Inc.* 275 BR 783, 785 (Bankr. W.D. Va. 2002). The filing of the bankruptcy petition was not properly authorized under CAH 12's organizational documents and, thus, this case must be dismissed.

CAH 12 has two Members, Health Acquisition Company, LLC ("HAC") and HMC/CAH Consolidated, Inc. ("HMC/CAH"). See, pg. 1, introduction paragraph, and pg. 18 of Agreement, attached to **Exhibit 7**. CAH 12's management and powers are controlled by the Agreement. The Agreement prohibits the filing of a bankruptcy on behalf of CAH 12 without the "prior unanimous written consent of the Members." To that end, Paragraph 4.1(f)(6) of the Agreement states:

11

Notwithstanding any provision of this agreement to the contrary, **the Company shall not** take enter, approve, cause, consent or permit the Company to **take any of the following actions without the prior unanimous written consent of the Members**:

\*\*\*\*

     (f)       initiate a proceeding for the bankruptcy of the Company;

See, pages 6-7 of Agreement, attached to **Exhibit 7** (emphasis added).

As shown above, the Receiver Order and Amendment to Receiver Order vested the Receiver with the sole authority to file bankruptcy for CAH 12. Additionally, CAH 12's own operating agreement forbids any bankruptcy filing without the written consent of ***both*** HAC ***and*** HMC/CAH. HMC/CAH has never given written consent for the filing of this bankruptcy, and further, does not consent to the continuation of this proceeding. See, **Exhibit 7**, ¶¶ 7-10. Consequently, this case must be dismissed immediately.

## CONCLUSION

There is a reason Jorge Perez (i) did not attach a formal corporate declaration of authority to file bankruptcy to CAH12's voluntary petition and (ii) directed counsel to check "None" on the Corporate Ownership Statement: he knew he did not have corporate authority to file bankruptcy under the Agreement, which he signed. HMC/CAH never gave prior written permission for this bankruptcy, and does not consent to its continuation.

Further, Perez was in essence "doubly foreclosed" from filing the current bankruptcy because under Oklahoma law, as set forth in the Receiver Order and in the Amendment to Receiver Order, the Receiver is the only one vested with the authority to file bankruptcy for CAH 12.

The Receiver has plans in place to ensure the adequate funding and the survival of Fairfax Hospital. The Receiver does not consent to this case. HMC/CAH did not authorize and does not consent to this case. For these reasons, this case must be dismissed.

DATED:  March 22, 2019

AYERS & HAIDT, P.A.

*/s/ David J. Haidt*
By:  David J. Haidt
N.C. State Bar No. 22092
Attorneys for Fairfax Healthcare Authority
Post Office Box 1544
New Bern, North Carolina  28563
(252) 638-2955 telephone
(252) 638-3293 facsimile
davidhaidt@embarqmail.com

13

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### GREENVILLE DIVISION

In Re:

CAH ACQUISITION COMPANY 12, LLC
d/b/a Fairfax Community Hospital,

                              Debtor.

Case No. 19-01229-5-JNC
Chapter 11

## NOTICE OF EMERGENCY MOTION TO DISMISS
### PURSUANT TO 11 U.S.C. § 1112(b)

NOTICE IS HEREBY GIVEN of that EMERGENCY MOTION TO DISMISS the pending Chapter 11 proceeding filed simultaneously herewith in the above captioned case by Fairfax Healthcare Authority ("Movant"); and,

FURTHER NOTICE IS HEREBY GIVEN that the pursuant to the Motion, the Movant is seeking the immediate dismissal of this Chapter 11 proceeding in accordance with the provisions of 11 U.S.C. § 1112(b); and

FURTHER NOTICE IS HEREBY GIVEN that this Motion may be allowed provided no response and request for a hearing is made by a party in interest in writing to the Clerk of this Court by 5:00 p.m., March 26, 2019. A hearing on the Debtor's Motion will be held on March 27, 2019, beginning at 2:00 p.m. in the 2nd Floor Courtroom, United States Bankruptcy Court, 150 Reade Circle, Greenville, North Carolina 27858.

DATE OF NOTICE:  March 22, 2019

                        AYERS & HAIDT, P.A.

                        */s/ David J. Haidt*
                        By:  David J. Haidt
                        N.C. State Bar No. 22092
                        Attorneys for Fairfax Healthcare Authority
                        Post Office Box 1544
                        New Bern, North Carolina  28563
                        (252) 638-2955 telephone
                        (252) 638-3293 facsimile
                        davidhaidt@embarqmail.com

<u>CERTIFICATE OF SERVICE</u>

I, David J. Haidt, Post Office Drawer 1544, New Bern, North Carolina 28563, certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on the 22nd day of March, 2019, a member of my office staff served copies of the foregoing Emergency Motion and Notice of Motion on the parties listed by electronic or facsimile and/or regular mail, postage prepaid.

I certify under penalty of perjury that the foregoing is true and correct.

EXECUTED ON:   March 22, 2019

BY:     */s/ David J. Haidt*
          DAVID J. HAIDT
          N.C. State Bar No. 22092

TO:

Bankruptcy Administrator (VIA CM/ECF)

Thomas W. Waldrep, Jr. (VIA CM/ECF)
Interim Chapter 11 Trustee

Rayford K. Adams, III, Esq. (VIA CM/ECF)
Attorney for Debtor

See attached Exhibit "A"

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) THE CITY OF PRAGUE, OKLAHOMA** | ) | |
| **and** | ) | |
| **(2) PRAGUE PUBLIC WORKS** | ) | |
| **AUTHORITY** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. CIV-19-89-G** |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **(3) CAH ACQUISITION COMPANY 7, LLC** | ) | |
| **(4) HMC/CAH CONSOLIDATED, INC.** | ) | |
| **(5) RURAL COMMUNITY HOSPITALS** | ) | |
| **OF AMERICA, LLC;** | ) | |
| **(6) EMPOWER H.M.S.;** | ) | |
| **(7) JORGE A. PEREZ;** | ) | |
| **(8) WCS CORPORATION, INC.,** | ) | |
| **successor-by-merger to CPP WOUND** | ) | |
| **CARE #24;** | ) | |
| **(9) LINCOLN COUNTY** | ) | |
| **TREASURER AND BOARD OF COUNTY** | ) | |
| **COMMISSIONERS, and** | ) | |
| **(10) JOHN DOES 1-10;** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DISCLOSURE STATEMENT IDENTIFYING CONSTITUENTS OF LLC OR PARTNERSHIP OF CAH ACQUISITION COMPANY 7, LLC

Pursuant to LCvR 7.1.1, Defendant CAH Acquisition Company 7, LLC submits its Disclosure Statement of Identifying Constituents of LLC or Partnership as follows:

1.      CAH Acquisition Company 7, LLC is a Delaware limited liability company with two members: 1) HMC/CAH Consolidated, Inc., a Delaware Corporation with its principal place of business in Kansas City, Missouri; and 2) Health Acquisition Company, LLC, a West Virginia limited liability.  The members of Health Acquisition Company, LLC are as follows:

Jorge Perez – domiciled in Florida

Ricardo Perez – domiciled in Florida

Carlos Perez - domiciled in Florida

Steven F. White - domiciled in West Virginia

Catherine White - domiciled in West Virginia

Paul L. Nusbaum - domiciled in West Virginia

Harriett F. Nusbaum - domiciled in West Virginia

2. No members or partners of CAH Acquisition Company 7, LLC are citizens of
the Plaintiffs' alleged state of citizenship.

Dated: February 1, 2019.

Respectfully submitted,

RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS

/s/ Peter W. Brolick
Peter W. Brolick, OBA No. 17781
Kristopher E. Koepsel, OBA No. 19147
502 West Sixth Street
Tulsa, OK 74119-1010
(918) 587-3161
(918) 587-9708 (Facsimile)
pbrolick@riggsabney.com
kkoepsel@riggsabney.com
*Attorneys for Defendants*
*CAH Acquisition Company 7, LLC;*
*        HMC/CAH Consolidated, Inc.;*
*Rural Community Hospitals of America,*
*LLC; Empower H.M.S.; and Jorge Perez*

## CERTIFICATE OF SERVICE

I hereby certify that on 1st day of February, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for Filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

J. Clay Christensen, OBA #11789
T.P. Howell, OBA #10347
Jeffrey E. Tate, OBA #17150
Brock Z. Pittman, OBA #32857
Christensen Law Group, P.L.L.C.
3401 NW 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Telephone: (405) 232-2020
Facsimile: (405) 228-1113
clay@christensenlawgroup.com
lynn@christensenlawgroup.com
jeffrey@christensenlawgroup.com
brock@christensenlawgroup.com


Joseph M. Vorndran, OBA #21391
Stuart & Clover, PLLC
130 N. Broadway, Suite 100
Shawnee, Oklahoma 74801
Telephone: (405) 275-0700
Facsimile: (405) 275-6805
joe@stuartclover.com

*Attorneys for Plaintiffs*

/s/ Peter W. Brolick
Peter W. Brolick

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) THE CITY OF PRAGUE, OKLAHOMA** )<br>and )<br>**(2) PRAGUE PUBLIC WORKS** )<br>**AUTHORITY** )<br> )<br>**Plaintiffs,** )<br> )<br> )<br>**v.** )<br> )<br>**(3) CAH ACQUISITION COMPANY 7, LLC** )<br>**(4) HMC/CAH CONSOLIDATED, INC.** )<br>**(5) RURAL COMMUNITY HOSPITALS** )<br>**OF AMERICA, LLC;** )<br>**(6) EMPOWER H.M.S.;** )<br>**(7) JORGE A. PEREZ;** )<br>**(8) WCS CORPORATION, INC.,** )<br>**successor-by-merger to CPP WOUND** )<br>**CARE #24;** )<br>**(9) LINCOLN COUNTY** )<br>**TREASURER AND BOARD OF COUNTY** )<br>**COMMISSIONERS, and** )<br>**(10) JOHN DOES 1-10;** )<br> )<br>**Defendants.** ) | | **Case No. CIV-19-89-G** |

## DISCLOSURE STATEMENT IDENTIFYING CONSTITUENTS OF LLC OR PARTNERSHIP OF EMPOWER H.M.S.

Pursuant to LCvR 7.1.1, Defendant Empower H.M.S. submits its Disclosure Statement of Identifying Constituents of LLC or Partnership as follows:

1. Empower H.M.S. is a Delaware limited liability company with members in Florida. The members of Empower H.M.S. are as follows:

Jorge Perez – domiciled in Florida

Ricardo Perez – domiciled in Florida

Carlos Perez - domiciled in Florida

2.      No members or partners of Empower H.M.S. are citizens of the Plaintiffs'

alleged state of citizenship.


        Dated: February 1, 2019.


                              Respectfully submitted,

                              RIGGS, ABNEY, NEAL, TURPEN,
                                ORBISON & LEWIS


                               /s/ Peter W. Brolick
                              Peter W. Brolick, OBA No. 17781
                              Kristopher E. Koepsel, OBA No. 19147
                              502 West Sixth Street
                              Tulsa, OK  74119-1010
                              (918) 587-3161
                              (918) 587-9708 (Facsimile)
                              pbrolick@riggsabney.com
                              kkoepsel@riggsabney.com
                              *Attorneys for Defendants*
                              *CAH Acquisition Company 7, LLC;*
                                    *HMC/CAH Consolidated, Inc.;*
                              *Rural Community Hospitals of America,*
                              *LLC; Empower H.M.S.; and Jorge Perez*

2

## CERTIFICATE OF SERVICE

I hereby certify that on 1st day of February, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for Filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

J. Clay Christensen, OBA #11789
T.P. Howell, OBA #10347
Jeffrey E. Tate, OBA #17150
Brock Z. Pittman, OBA #32857
Christensen Law Group, P.L.L.C.
3401 NW 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Telephone: (405) 232-2020
Facsimile: (405) 228-1113
clay@christensenlawgroup.com
lynn@christensenlawgroup.com
jeffrey@christensenlawgroup.com
brock@christensenlawgroup.com


Joseph M. Vorndran, OBA #21391
Stuart & Clover, PLLC
130 N. Broadway, Suite 100
Shawnee, Oklahoma 74801
Telephone: (405) 275-0700
Facsimile: (405) 275-6805
joe@stuartclover.com

*Attorneys for Plaintiffs*

/s/ Peter W. Brolick
Peter W. Brolick

3

# Exhibit 3

**IN THE DISTRICT COURT OF OSAGE COUNTY**
**STATE OF OKLAHOMA**

THE TOWN OF FAIRFAX; THE FAIRFAX
PUBLIC WORKS AUTHORITY; and THE TOWN
OF FAIRFAX BOARD OF CONTROL,

Plaintiffs,

vs.

CAH ACQUISITION COMPANY 12, LLC;
HMC/CAH CONSOLIDATED, INC.;
EMPOWER HEALTHCARE, LLC;
RURAL COMMUNITY HOSPITALS OF
AMERICA, LLC; INDIAN ELECTRIC
COOPERATIVE, INC.; SALLY HULSE in her
Official Capacity as OSAGE COUNTY
TREASURER, and JOHN DOES 1-10,

Defendants.

District Court Osage County Okla.
FILED
FEB 2 7 2019
Jewette Boyd, Court Clerk
By _____ Deputy

Case No. CJ-2018-232

**ORDER APPOINTING RECEIVER**

On this _27_ day of February 2019, Plaintiffs' *Emergency Application for Appointment of Receiver* and their *Motion for Temporary Injunction* (the "Emergency Application") seeking the immediate appointment of a receiver and a temporary injunction come before the Court. Plaintiffs appear by and through their counsel of record, T. P. Howell and Jeffrey E. Tate, of the firm Christensen Law Group, PLLC. Defendants CAH Acquisition Company 12, LLC; Rural Community Hospitals Of America, LLC; and Empower Healthcare, LLC appear by and through their counsel of record Peter W. Brolick and ~~Kristopher E. Koepsel,~~ of the firm Riggs, Abney Neal, Turpen, Orbison & Lewis, P.C.; Indian Electric Cooperative, Inc.; Osage County Treasurer and; and John Does 1-10, do not appear in person or by counsel.

Having reviewed the pleadings, and having heard the testimony of witnesses, the Court finds and concludes that it is necessary to appoint a receiver in order to conserve and protect the properties and interests which are the subject of this action, conserve and protect the business operations of the Fairfax Community Hospital (the

"Hospital") conducted therewith, and protect the health, safety, and welfare of the patients of the Hospital facilities operated thereon as set forth below.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that:

1. Fairfax Healthcare Authority, an Oklahoma public trust created under the authority of and pursuant to the provisions of 60 Okla. Stat. §§ 176 *et seq*., is appointed as receiver (the "Receiver") of (a) CAH Acquisition Company 12, LLC ("CAH 12"), (b) all property, assets, rights, and privileges of CAH 12 of any kind or nature, including all real, personal, tangible, intangible, and intellectual property, all licenses (including the Fairfax Hospital License), all Medicare / Medicaid provider numbers (including Medicare Provider Agreement) and any other National Provider Identifier, and all financial accounts and rights of CAH 12 (the "CAH 12 Assets"), as well as (c) all personal property located upon and within the property and facilities (the "Other Property").

2. The Receiver shall comply with the licensing requirements of the Oklahoma State Department of Health ("OSDH").

3. The Receiver's appointment shall become effective upon the filing herein of an oath of receiver as provided by law, and upon posting bond in the amount of $10,000. $5,000 for injunction and $5,000 for receiver.

4. The Receiver, when so qualified, shall immediately:

   a. take control and possession of CAH 12, the CAH 12 Assets, as well as the Other Property. Defendants and all persons holding under them are ordered and directed to deliver forthwith control and possession thereof to the Receiver;

   b. operate the Hospital, to the extent not prohibited by applicable regulatory authorities and subject to the licensing requirements of OSDH, as a critical

2

access hospital facility under the Hospital's current name(s), employer identification number(s), and Medicare / Medicaid provider numbers;

c.  maintain the Hospital's existing bank accounts, and account for the income and expenses of the Hospital;

d.  collect all payments, receivables, reimbursements, revenues, income, issues, royalties, profits and other benefits derived from CAH 12 and / or operation of the Hospital, including, but not limited to, those paid or payable by the Medicare and Medicaid programs and other payers;

e.  pay all expenses of the Hospital including, but not limited to, accumulated taxes real or personal property taxes, insurance premiums, repairs necessary to preserve the Hospital in good condition, and all expenses reasonably required to carry on the business and pay the ordinary expenses associated with the operation of the Hospital;

f.  complete all necessary forms needed to transfer CAH 12's licenses (including the Fairfax Hospital License) to the Receiver;

g.  complete all necessary forms needed to transfer CAH 12's Medicare / Medicaid provider number (including Medicare Provider Agreement) to the Receiver;

h.  provide reports when requested by the Court and as reasonably requested by the parties' counsel; and

i.  take all other reasonable actions as may be appropriate or necessary, or as this Court may authorize in furtherance of the duties stated above, until further order of this Court.

5.       The Receiver shall be entitled to reasonable compensation as determined by the Court upon application.  Dismissal of this case shall be ineffective to divest the Court of jurisdiction to hear and approve any requested fees and expenses of the Receiver and to discharge the Receiver and any bond.

6.       The Receiver shall serve until further order of the Court terminating this receivership.  The Receiver may resign the position only upon thirty (30) days written notice to all parties of record and upon approval of the Court.

7.       The Defendants and any and all others in possession and control of CAH 12, the CAH 12 Assets, or the Other Property shall, upon the entry of this Order and the qualification of the Receiver, immediately:

   a.       surrender and deliver control and possession of CAH 12, the CAH 12 Assets, and the Other Property to the Receiver;

   b.       provide the Receiver with all necessary keys, pass-codes, passwords, and all other methods of access to computers, equipment and other devises used for the benefit of the Hospital;

   c.       provide the Receiver with all documentation, passwords, access codes and other information requested by the Receiver with respect to all bank accounts, deposit accounts and other accounts of CAH 7;

   d.       provide the Receiver with all documentation, passwords, access codes and other information requested by the Receiver with respect to all provider numbers (including Medicare / Medicaid provider numbers) and contracts or other rights and privileges of CAH 12 and the CAH 12 Assets, with respect to payments or rights of reimbursement under the Medicare and

4

Medicaid programs and other payers, and with respect to the PECOS system;

e.  deliver to the Receiver the originals or true and correct copies of all books, filings, records, contracts, documents, data and other materials relating to CAH 12, to the CAH 12 Assets, and to the Other Property, including without limitation: vendor contracts; HIPAA business associate agreements; residency and admissions agreements; resident records; policy and procedure manuals relating to the Hospital; employment records; employee health and other benefits information, including, without limitation, employee health and benefit plan documents; financial, accounting, tax and corporate records; balance sheets; accounts receivable and accounts payable data; billing and collection data; resident trust funds information; payer contracts; licenses; registrations; accreditations; certifications; certificates of occupancy; other governmental approvals; correspondence, statements of deficiencies, plans of correction and other survey and inspection documentation, reports and other communications with federal and/or state regulators; Medicare and Medicaid contracts, cost reports, certification documentation, National Provider Identifier Numbers, all other provider numbers, and Electronic Data Interchange ("EDI") Submitter identification numbers; Electronic Funds Transfer ("EFT") authorization agreements, numbers and arrangements; website information; warranty and guaranty records; valuations, appraisals and feasibility studies, reports and surveys; environmental, structural and

physical plant audits and reports; architectural and engineering plans,

drawings and specifications; property surveys; title insurance policies;

other insurance policies; domain name, trade name, trademark, service

mark, and copyright information; telephone and facsimile numbers; email

addresses; and all passwords and access codes relating to the foregoing;

f.    generally provide cooperation and assistance to the Receiver including the

demonstration to the Receiver of the physical layout, the characteristics,

amenities, and problem areas associated with and about the Hospital, and

the prompt answering of oral or written questions from the Receiver to

Defendants or any and all of its partners, agents or representatives, to

enable the Receiver to assume promptly and discharge fully its duties

under this receivership;

g.    turn over any and all accounts, receivables, funds, monies, payments,

reimbursements, rents, revenues, income, issues, royalties, profits and

other benefits in the possession or control of Defendants, their agents or

representatives in connection with and/or otherwise relating to CAH 12,

the CAH 12 Assets, and the Other Property. Any and all accounts,

receivables, funds, monies, payments, reimbursements, rents, revenues,

income, issues, royalties, profits and other benefits received by or owing

to Defendants or their agents or representatives in connection with the

Hospital after the date of this Order shall be held in trust for the Receiver,

shall not be negotiated, and shall be turned over to the Receiver in the

original form in which they are received within forty-eight (48) hours of receipt;

h.    reasonably cooperate in the completion and filing of such change(s) of information and other notices and filings requested by the Receiver pertaining to the Hospital's Medicare and Medicaid certifications and enrollment, licensure, including without limitation notices and filings necessary to remove the current managing, controlling, authorized and delegated parties, officials and representatives relating to the Hospital, and substituting the Receiver and designees;

i.    otherwise reasonably cooperate with the Receiver and all others to effectuate a smooth and orderly transition of CAH 12, the CAH 12 Assets, and control of the Hospital's operations to the Receiver without disruption or impairment of such operations, including leaving in place fully operational IT systems.

8.    Upon and after entry of this Order, Defendants are enjoined from doing anything that would disrupt, impair adversely affect, or otherwise complicate the smooth and orderly transition of CAH 12, the CAH 12 Assets, the Other Property, and control of the Hospital's operations to the Receiver, or continued and ongoing operations of the Hospital by the Receiver, as contemplated by this Order. Without limiting the generality of the foregoing, the Defendants shall not change, amend, alter, modify, terminate or cancel any of their employee benefit or welfare plans, contracts, accounts or account instructions, passwords, access codes, Medicare, Medicaid or other payer enrollment or contracts, Electronic Funds Transfer ("EFT") authorization agreements, numbers and arrangements, National Provider Identifier Numbers,

other provider numbers, Electronic Data Interchange ("EDI") Submitter identification numbers,

and/or employer identification numbers, e-mail systems or other IT systems.  Defendants shall

not terminate or change the terms of employment of employees working at or for the Hospital,

solicit the employees to cease working at or for the Hospital, or otherwise interfere with the

employees' continued and ongoing work at or for the Hospital.

        9.     If the Receiver and Plaintiffs determine it is necessary and in the best interests of

the Hospital and its current or future patients, the Receiver shall be authorized to enter into one

or more consulting, administrative, management and/or other support services agreement(s) with

firms acceptable to the Receiver and Plaintiffs upon such terms and conditions as the Receiver

and Plaintiffs deem reasonable, including without limitation the provision of consulting,

administrative, management and/or other support services, responsibility for care, accounts

payable, accounts receivable and monthly financial statements.  The Receiver is authorized to

pay reasonable compensation to such management firms and reimburse them for reasonable out

of pocket costs and expenses.

        10.    The Receiver shall be entitled to reimbursement for reasonable out of pocket costs

and expenses, including the reasonable cost of an attorney, in connection with the performance

of its duties as specified herein.

        11.    To the extent that the Receiver determines it is appropriate to do so, the Receiver

is authorized to obtain any other licenses, permits, certificates or other authorizations as may be

required under state, federal or local law to operate, manage and maintain the Hospital, and

collect the revenues and income generated by operation of the Hospital, including, but not

limited to, Medicare and Medicaid payments.

12.    The Receiver shall have the right to issue subpoenas to obtain documents and records pertaining to the administration of the receivership estate (the "Estate"), and conduct discovery in this action on behalf of the Estate.

13.    In the event that any parties to this action or any entities owned by Defendants, either individually or collectively, have assets in their possession or have transferred assets that may be or were property of the parties, the parties shall identify those assets and at the Receiver's discretion, turn the assets over to the Receiver for further disposition. All such property shall be included in the Estate.

14.    The Receiver is specifically vested with the discretion to be exercised in his business judgment to either continue the operations of the business of CAH 12 and the Hospital in their ordinary course to preserve their going concern value or to reduce such operations to the point of cessation.

15.    The parties and all other persons or entities served with a copy of this Order shall cooperate fully with and assist the Receiver in the performance of his duties subject to Plaintiffs' or Defendants' appropriate assertion of the Fifth Amendment privilege against self-incrimination, and other appropriate assertion of any other privilege or right.  This cooperation and assistance shall include, but not be limited to: turning over any and all property of the Estate; providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under this Order; providing any password required to access any computer or electronic files in any medium; turning over any assets (cash or other tangible assets); and advising all persons who owe money to the Parties that all debts should be paid directly to the Receiver.

9

16.     Defendants and all other managers, members, directors, officers, employees, agents, independent contractors and other natural or legal entities acting in concert with them are hereby enjoined from directly or indirectly transferring, dissipating or otherwise disposing of any of the property of the Estate and its proceeds, or from otherwise transferring, concealing, destroying or making any other disposition of any personal or company assets including, but not limited to, funds in bank or brokerage accounts, automobiles or any other real or personal property owned, possessed or controlled by any of them without prior authorization from the Court.

17.     The Receiver is covered by the doctrine of Judicial Immunity and any of his actions shall be governed by the Business Judgment Rule.

18.     The Receiver shall be entitled to facilitate the transition of the critical access hospital operations conducted by the Hospital as well as the Fairfax Hospital License and provider number, if necessary, to a new operator, lessee or owner as may be chosen by Plaintiffs as owner of the Hospital Premises, upon ultimate approval of OSDH, as may be necessary.

19.     The Receiver is authorized in its sole discretion and without further order of the Court to remove any property from the Estate that it deems burdensome or of inconsequential value, whereupon such property shall re-vest in Defendants.

20.     The Receiver shall have the right to borrow funds, upon motion and approval by the Court, as necessary to carry out the duties and responsibilities of the Receiver, including, without limitation, to defray operating expenses incurred in connection with the administration of the Estate.

10

21.     The Receiver may at any time by filing a motion upon notice to all parties, seek entry of a further order from the Court for such other and further authority as it may deemed necessary or desirable by the Receiver for the administration, protection or benefit of the Estate.

22.     Notwithstanding any future modification, vacation, or stay of any or all of the provisions of this Order, the Receiver shall be entitled to all the rights, remedies, privileges, and benefits granted herein.

23.     To the extent permitted by law, the provisions of this Order shall be binding upon and inure to the benefit of the Receiver and all of the parties, their respective successors and assigns including any trustee hereinafter appointed as a representative of the Estate herein, or of the Estate in any subsequent proceedings under the Bankruptcy Code, and all creditors of the defendants and other parties in interest.

24.     In order to promote judicial efficiency, all persons who receive actual or constructive notice of this Order are enjoined in any way from disturbing or in any way interfering with the Receiver's administration of the Estate or from prosecuting any new proceedings (including collection or enforcement proceedings) that involve the Receiver or the Estate unless such person or persons first obtains the permission of the Court or the Receiver. Except to the extent relief is sought in this action, all parties to this case and any other entity given notice of this Order are hereby enjoined from any and all of the following: (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against CAH 12, the Hospital, the Estate or the Receiver that was or could have been commenced before the entry of this Order or to recover a claim against CAH 12, the Hospital, the Estate or the Receiver, that arose before the entry of this Order; (2) any act to obtain possession of or to exercise control over the Estate or any property

11

thereof; (3) any act to create, perfect, or enforce any lien against the Estate or any property thereof; (4) any act to create, perfect, or enforce against the Estate or any property thereof any lien to the extent that such lien secures a claim that arose before the entry of this Order; (5) any act to collect, assess, or recover a claim against CAH 12, the Hospital, the Estate or any property thereof, or the Receiver that arose before the entry of this Order; or (6) the setoff of any debt owing to CAH 12 or other Defendant on account of the Hospital, that arose before the entry of this Order against any claim against CAH 12, the Hospital, the Estate or any property thereof or the Receiver.

25.     The injunctive relief granted herein may be modified or waived only by (1) written approval from the Receiver or his counsel or (2) by order of the Court upon proper motion, after notice and a hearing.

26.     The Receiver shall have additional injunctive relief granted to compel any cause of action against the parties to this case after Court approval for any issue not contemplated herein.

27.     The Receiver shall have the right to privileged confidential communications with all counsel in this case pursuant to Title 12 O.S. § 2502, and any federal counterpart thereto if applicable.

28.     Utilities companies and other providers of utility services, including without limitation, electricity, gas, water, sewage, waste water, recycling services, refuse, garbage, television/cable and telephone are directed not to demand security deposits or to discontinue service. The utility companies and other providers are also directed to assist in any and all requests made by the Receiver and/or his staff in relation to any accounts in the name of CAH 12 or of the other Defendants in connection with the Hospital, and any and all of the addresses

associated therewith. These requests include but are not limited to the turning on and off of
utilities, the transfer of the utilities into the Estate, and any other requests made to assist the
Receiver in his duties.

29.     All persons or entities, including banks, controlling possession of any property of
the Estate, including Medicare and Medicaid payments currently due or to become due, shall
cooperate with the Receiver on the direction thereof. Upon presentation of this Order all persons,
or entities, including banks, shall turn over all funds, bank accounts, and safety deposit boxes of
CAH 12, to the Receiver without delay and delete all designated signors on the bank account.

30.     The Receiver may but shall not be obligated in any manner to prepare or file any
delinquent, current or future state or federal income tax returns and shall not be individually held
personally responsible for any local, state or federal income, property, payroll or other taxes of
CAH 12 except for payroll or sales taxes incurred as a result of the Receiver's administration of
the Estate. The Estate shall not constitute a separate or new taxpayer.

31.     The Receiver is empowered to file a voluntary petition for relief pursuant to 11
U.S.C. §101 *et seq*. for CAH 12 if such is deemed appropriate in the sole discretion of the
Receiver in the exercise of his business judgment. The Defendants' officers, directors, managers,
members and/or shareholders are specifically enjoined from taking any action inconsistent with
the terms of this Order and from authorizing any action by the defendants inconsistent with the
by-laws or operating agreement as of the entry of this Order.

32.     The individual representatives of CAH 12, RHCA, HMC, and Empower are
hereby authorized and directed to perform all acts, take any action, and execute and comply with
the terms of such other documents, instruments, and agreements, as the Receiver may reasonably

13

require as evidence of and for the protection of the Estate or that may be otherwise deemed necessary by the Receiver to effect the terms and conditions of this Order.

33. All parties shall notice the Receiver on any and all filings with the Court and hearing dates.

34. ALL PERSONS HAVING NOTICE OF THIS ORDER ARE HEREBY ADVISED THAT THE TERMS OF THIS ORDER, INCLUDING BUT NOT LIMITED TO THE INJUNCTIVE RELIEF GRANTED HEREIN, SHALL BE ENFORCEABLE.

35. The Court reserves the right to modify and supplement this Order from time to time as may be deemed necessary and advisable.

IT IS SO ORDERED THIS _27_ DAY OF FEBRUARY, 2019.

Pronounced: 1:20 ᵖᵘ
Signed 1:24 ᵖᵘ

_____
John Kane, Judge of the District Court of
Osage County, State of Oklahoma

APPROVED AS TO FORM:

_____
J. Clay Christensen (OBA # 11789)
T.P. Howell (OBA # 10347)
Jeffrey E. Tate (OBA #17150)
Brock Z. Pittman (OBA # 32853)
Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
(405) 232-2020 Telephone
(405) 236-1012 Facsimile
clay@christensenlawgroup.com
lynn@christensenlawgroup.com
jeffrey@christensenlawgroup.com
brock@christensenlawgroup.com

14

- *and* –

Jess M. Kane (OBA # 22418)
Robinett, King, Elias, Bulinger,
Brown & Kane
P.O. Box 1066
Bartlesville, Oklahoma 74801
(918) 336-4132  Telephone
jkane@robinettking.com

*Attorneys for Plaintiffs*

15

# Exhibit 4

**IN THE DISTRICT COURT OF OSAGE COUNTY**
**STATE OF OKLAHOMA**

THE TOWN OF FAIRFAX; THE FAIRFAX
PUBLIC WORKS AUTHORITY; and THE TOWN
OF FAIRFAX BOARD OF CONTROL,

                                   Plaintiffs,

vs.

CAH ACQUISITION COMPANY 12, LLC;
HMC/CAH CONSOLIDATED, INC.;
EMPOWER HEALTHCARE, LLC;
RURAL COMMUNITY HOSPITALS OF
AMERICA, LLC; INDIAN ELECTRIC
COOPERATIVE, INC.; SALLY HULSE in her
Official Capacity as OSAGE COUNTY
TREASURER, and JOHN DOES 1-10,

                                  Defendants.



District Court, Osage County, Okla.
FILED

MAR   8 2019

JENNIFER BURD, Court Clerk
By_____ Deputy

Case No. CJ-2018-232

## AMENDMENT TO ORDER APPOINTING RECEIVER

On this ⟨6⟩ day of March 2019, Plaintiffs' *Emergency Application for Ex Parte Amended to Receivership Order* (the "Emergency Application") seeking the immediate amendment to the receivership order granted by this Court on February 27, 2019 (the "Receivership Order"), comes before the Court. Plaintiffs appear by and through their counsel of record, Jeffrey E. Tate, of the firm Christensen Law Group, PLLC. Defendants CAH Acquisition Company 12, LLC; Rural Community Hospitals Of America, LLC; and Empower Healthcare, LLC; Indian Electric Cooperative, Inc.; Osage County Treasurer and; and John Does 1-10, do not appear in person or by counsel.

Having reviewed the pleadings, the Court finds and concludes that it is necessary to amend the receivership order to conserve and protect the properties and interests which are the subject of this action, conserve and protect the business operations of the Fairfax Community Hospital (the

"Hospital") conducted therewith, and protect the health, safety, and welfare of the patients of the Hospital facilities operated thereon as set forth below. The Court **FINDS AS FOLLOWS**:

> (a) The Court has fully reviewed the Emergency Application;
>
> (b) The Emergency Application is appropriately considered *ex parte* because of the Hospital's unique and special situation as an entity that provides and protects the health, safety, and welfare of the patients of the Hospital and the citizens of the State of Oklahoma; and
>
> (c) The Receivership Order over CAH Acquisition Company 12, LLC ("CAH 12"): (i) is and continues to be in full force and effect, (ii) is hereby modified, amended, and supplemented as expressly reserved and permitted by the Receivership Order, and (iii) such modification, amendment, and supplement relates back to the original entry of the Receivership Order on February 27, 2019.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that:

1.      The Fairfax Healthcare Authority (the "Receiver"), and no one else, shall be vested with the sole and exclusive power and authority to file and maintain a voluntary bankruptcy petition under the United States Bankruptcy Code, Title 11 U.S.C. § 101, *et seq*.

2.      The Receiver, and no one else, shall be vested with the sole and exclusive power and authority to voluntary dismiss a bankruptcy petition under the United States Bankruptcy Code, Title 11 U.S.C. § 101, *et seq*.

3.      The Receiver shall have the sole power and authority, consistent with the terms of the Court's February 27, 2019 *Order Appointing Receiver*, (i) to oversee and make all final decisions concerning the litigation relating to CAH 12[1], the CAH 12 Assets and the Other Property,

---

[1] All capitalized terms not defined herein are as defined in the Order Appointing Receiver.

2

including but not limited to entry of litigation settlements and consent judgement, (ii) to remove any existing managers, and identify and appoint qualified individuals to serve as manager of CAH 12, (iii) analyze, market and sell any or all of the CAH 12 Assets or Other Property, and (iv) manage and operate CAH 12 on a daily basis.

    4.    The Court reserves the right to modify and supplement this Order from time to time as may be deemed necessary and advisable.

IT IS SO ORDERED THIS _____8_____ DAY OF MARCH, 2019.

<br>

_____
John Kane, Judge of the District Court of
Osage County, State of Oklahoma

3

APPROVED AS TO FORM:

J. Clay Christensen (OBA # 11789)
T.P. Howell (OBA # 10347)
Jeffrey E. Tate (OBA #17150)
Brock Z. Pittman (OBA # 32853)
Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
(405) 232-2020  Telephone
(405) 236-1012  Facsimile
clay@christensenlawgroup.com
lynn@christensenlawgroup.com
jeffrey@christensenlawgroup.com
brock@christensenlawgroup.com

- *and* –

Jess M. Kane (OBA # 22418)
Robinett, King, Elias, Bulinger,
Brown & Kane
P.O. Box 1066
Bartlesville, Oklahoma 74801
(918) 336-4132  Telephone
jkane@robinettking.com

*Attorneys for Plaintiffs*

STATE OF OKLAHOMA } SS
COUNTY OF OSAGE

JENNIFER PURDY, COUNTY CLERK, in and for
[illegible] hereby certify that the
[illegible] and complete
[illegible] of the
[illegible] of record.

Witness my [illegible] 8
day of _____ March 14 ____
COUNTY CLERK

BY _____ DEPUTY

4

# Exhibit 5

**IN THE DISTRICT COURT OF OSAGE COUNTY**
**STATE OF OKLAHOMA**

THE TOWN OF FAIRFAX; THE FAIRFAX
PUBLIC WORKS AUTHORITY; and THE TOWN
OF FAIRFAX BOARD OF CONTROL,

                                    Plaintiffs,

vs.

CAH ACQUISITION COMPANY 12, LLC;
HMC/CAH CONSOLIDATED, INC.;
EMPOWER HEALTHCARE, LLC;
RURAL COMMUNITY HOSPITALS OF
AMERICA, LLC; INDIAN ELECTRIC
COOPERATIVE, INC.; SALLY HULSE in her
Official Capacity as OSAGE COUNTY
TREASURER, and JOHN DOES 1-10,

                                    Defendants.

Case No. CJ-2018-232

## OATH OF RECEIVER

Fairfax Healthcare Authority, the Receiver appointed by this Court in the above-
captioned action on the 27th day of February, 2019, does solemnly swear that it will faithfully
discharge its duties as Receiver, and will take possession of and faithfully account for all
property and money that may come into its hands as Receiver, and that it will obey the Orders of
the Court entered in this case.

FAIRFAX HEALTHCARE AUTHORITY

By _____, Trustee

STATE OF OKLAHOMA )
                            )  SS:
COUNTY OF OSAGE   )

Subscribed and sworn to before me this __1__ day of ~~February~~ *March*, 2019, by

_Charles Cartwright_____, Trustee of the Fairfax Healthcare Authority.

Notary Public
Commission No.: __17000216__

My Commission Expires:

__1 9 2021__
(SEAL)



**RLI** ®
RLI Surety
A Division of RLI Insurance Company
P.O. Box 3967  Peoria, IL 61612-3967
Phone: 309-692-1000  Fax: 309-692-8637

# INJUNCTION BOND

BOND NO. __LSM1270603__

STATE OF ___Oklahoma___ } ss    IN THE __Osage County District__ COURT

County of ___Osage___                      Case No. __CJ-2018-232__

Plaintiff(s)  The Town of Fairfax, Et Al

vs.

Defendant(s)  CAH Acquisition Company 12, LLC Et Al

**KNOW ALL MEN BY THESE PRESENTS:**

WHEREAS, Plaintiff,
_____The Town of Fairfax, Et Al_____, has duly applied
to the Court for an _____Injunction_____ against the Defendant, _____
__CAH Acquisition Company 12, LLC Et Al__, and that said Injunction was entered on
_2-27-2019_,
Town of Fairfax Board of Control and Town of Fairfax,
WHEREAS, __Fairfax Public Works Authority__, as Principal, and **RLI Insurance Company** of Peoria,
Illinois, a corporation organized and existing under the laws of the State of Illinois, as Surety, are held and firmly bound unto
____The Osage County District Court____ in the sum of
_____Five Thousand Dollars and no/100_____ Dollars ( _$5,000.00_ )
lawful money of the United States, to be paid to Defendant or his assigns.

NOW, THEREFORE, the condition of this obligation is such that if the Injunction is dissolved, Plaintiff jointly and severally
agrees to pay any damages and costs sustained by or assessed against the Defendant by reason or the wrongful issuance of the
injunction order; provided, however, that the obligation under this bond is limited to _$5,000.00_ .

This bond becomes effective on the _4th_ day of _March_, _2019_ .

Dated this _4th_ day of _March_, _2019_ .

Principal:

By:

Surety:  **RLI Insurance Company**

By: _Jamie Hollister_                         Attorney-In-Fact

Countersigned by:

_____
Resident Agent

Approved by:

_____
Title

J0009D98-40,0

# POWER OF ATTORNEY

## RLI Insurance Company

9025 N. Lindbergh Dr. Peoria, IL 61615
Phone: 800-645-2402

Bond No. __LSM1270603__

### *Know All Men by These Presents:*

That the _____ **RLI Insurance Company** _____, a corporation organized and existing under the laws of the State of _____ Illinois _____, and authorized and licensed to do business in all states and the District of Columbia does hereby make, constitute and appoint: _____ Tamie Hollister _____ in the City of _____ Pawhuska _____, State of _____ Oklahoma _____, as its true and lawful Agent and _____ Attorney In Fact _____, with full power and authority hereby conferred upon him/her to sign, execute, acknowledge and deliver for and on its behalf as Surety, in general, any and all bonds and undertakings in an amount not to exceed _____ Ten Million and 00/100 _____ Dollars ( ___ $10,000,000.00 ___ ) for any single obligation, and specifically for the following described bond.

**Principal:** __Town of Fairfax Board of Control and Town of Fairfax, Fairfax Public Works Authority__
**Obligee:** __10th Judicial District Court - Osage County__
**Type Bond:** __Injunction__
**Bond Amount:** $ __5,000.00__
**Effective Date:** March 4, 2019

The _____ **RLI Insurance Company** _____ further certifies that the following is a true and exact copy of a Resolution adopted by the Board of Directors of _____ **RLI Insurance Company** _____, and now in force to-wit:

> "All bonds, policies, undertakings, Powers of Attorney or other obligations of the corporation shall be executed in the corporate name of the Company by the President, Secretary, any Assistant Secretary, Treasurer, or any Vice President, or by such other officers as the Board of Directors may authorize. The President, any Vice President, Secretary, any Assistant Secretary, or the Treasurer may appoint Attorneys in Fact or Agents who shall have authority to issue bonds, policies or undertakings in the name of the Company. The corporate seal is not necessary for the validity of any bonds, policies, undertakings, Powers of Attorney or other obligations of the corporation. The signature of any such officer and the corporate seal may be printed by facsimile."

IN WITNESS WHEREOF, the _____ **RLI Insurance Company** _____ has caused these presents to be executed by its _____ Vice President _____ with its corporate seal affixed this ___ 4th ___ day of _____ March _____, ___ 2019 ___.

RLI Insurance Company

By: *B. H. W. D.*
Barton W. Davis      Vice President

State of Illinois
    } SS
County of Peoria

On this ___ 4th ___ day of ___ March ___, ___ 2019 ___, before me, a Notary Public, personally appeared _____ Barton W. Davis _____, who being by me duly sworn, acknowledged that he signed the above Power of Attorney as the aforesaid officer of the _____ **RLI Insurance Company** _____ and acknowledged said instrument to be the voluntary act and deed of said corporation.

By: *Gretchen L. Johnigk*
Gretchen L. Johnigk      Notary Public

GRETCHEN L JOHNIGK
"OFFICIAL SEAL"
My Commission Expires
May 26, 2020

### CERTIFICATE

I, the undersigned officer of _____ **RLI Insurance Company** _____ do hereby certify that the attached Power of Attorney is in full force and effect and is irrevocable; and furthermore, that the Resolution of the Company as set forth in the Power of Attorney, is now in force. In testimony whereof, I have hereunto set my hand and the seal of the _____ **RLI Insurance Company** _____ this ___ 4th ___ day of _____ March _____, ___ 2019 ___.

RLI Insurance Company

By: *Jean M. Stephenson*
Jean M. Stephenson      Corporate Secretary

A0006817_SUBS

# RLI®

RLI Insurance Company
P.O. Box 3967 Peoria IL 61612-3967
Phone: (309)692-1000 Fax: (309)683-1610

# RECEIVER'S BOND

Bond No. __LSM1270600__

STATE OF _____Oklahoma_____

County of _____Osage_____

} ss

10th Judicial District Court - Osage
IN THE _____ County

NO. _____CJ-2018-232_____

Plaintiff(s):    The Town of Fairfax, Et Al

Vs.

Defendant(s):    CAH Acquisition Company, 12, LLC, Et Al

KNOW ALL MEN BY THESE PRESENTS:

That we, _____Fairfax Healthcare Authority_____
as Principal, and the _____RLI Insurance Company_____, a corporation duly licensed to do
business in the State of _____Oklahoma_____ as Surety, are held and firmly bound
unto _____10th Judicial District Court - Osage County_____ in the sum of
_____Five Thousand and 00/100_____ DOLLARS
( __$ 5,000.00__ ), for the payment of which well and truly to be made, we bind ourselves and our legal
representatives, jointly and severally by these presents.

THE CONDITION OF THE ABOVE OBLIGATION IS SUCH, That whereas on the _____ day of _____,
_____, the above named Principal was appointed Receiver in the above entitled matter.

NOW THEREFORE, if the said Principal shall faithfully discharge the duties of Receiver in said action, and shall obey
the orders of the Court therein, then this obligation to be null and void, othewise to remain in full force and effect.

Dated this ___4th___ day of _____March_____, _2019_.

Fairfax Healthcare Authority
Principal

By _____

RLI Insurance Company

By ___Tamie Hollister___    Attorney In Fact
     Tamie Hollister

Page    1

J0005210-40,0

# POWER OF ATTORNEY

### RLI Insurance Company

9025 N. Lindbergh Dr.  Peoria, IL 61615
Phone:  800-645-2402

Bond No.  LSM1270600

## *Know All Men by These Presents:*

That the _____ **RLI Insurance Company** _____, a corporation organized and existing under the laws of the State of _____ **Illinois** _____, and authorized and licensed to do business in all states and the District of Columbia does hereby make, constitute and appoint: _____ **Tamie Hollister** _____ in the City of _____ **Pawhuska** _____, State of _____ **Oklahoma** _____, as it's true and lawful Agent and _____ **Attorney In Fact** _____, with full power and authority hereby conferred upon him/her to sign, execute, acknowledge and deliver for and on its behalf as Surety, in general, any and all bonds and undertakings in an amount not to exceed _____ **Five Million and 00/100** _____ Dollars ( _____ **$ 5,000,000.00** _____ ) for any single obligation, and specifically for the following described bond.

**Principal:** _____ **Fairfax Healthcare Authority** _____
**Obligee:** _____ **10th Judicial District Court - Osage County** _____
**Type Bond:** _____ **Receiver Bond** _____
**Bond Amount:** $ _____ **5,000.00** _____
**Effective Date:** _____ **March 4, 2019** _____

The _____ **RLI Insurance Company** _____ further certifies that the following is a true and exact copy of a Resolution adopted by the Board of Directors of _____ **RLI Insurance Company** _____, and now in force to-wit:

"All bonds, policies, undertakings, Powers of Attorney or other obligations of the corporation shall be executed in the corporate name of the Company by the President, Secretary, any Assistant Secretary, Treasurer, or any Vice President, or by such other officers as the Board of Directors may authorize. The President, any Vice President, Secretary, any Assistant Secretary, or the Treasurer may appoint Attorneys in Fact or Agents who shall have authority to issue bonds, policies or undertakings in the name of the Company. The corporate seal is not necessary for the validity of any bonds, policies, undertakings, Powers of Attorney or other obligations of the corporation. The signature of any such officer and the corporate seal may be printed by facsimile."

IN WITNESS WHEREOF, the _____ **RLI Insurance Company** _____ has caused these presents to be executed by its _____ **Vice President** _____ with its corporate seal affixed this _____ **4th** day of _____ **March** _____, _____ **2019** _____.

**RLI Insurance Company**

By: _Barton W. Davis_ (signature)
Barton W. Davis                                    Vice President

State of Illinois   }
                    } SS
County of Peoria    }

On this _____ **4th** day of _____ **March** _____, _____ **2019** _____, before me, a Notary Public, personally appeared _____ **Barton W. Davis** _____, who being by me duly sworn, acknowledged that he signed the above Power of Attorney as the aforesaid officer of the _____ **RLI Insurance Company** _____ and acknowledged said instrument to be the voluntary act and deed of said corporation.

By: _Gretchen L. Johnigk_ (signature)
Gretchen L. Johnigk                                    Notary Public

GRETCHEN L JOHNIGK
"OFFICIAL SEAL"
NOTARY PUBLIC
STATE OF ILLINOIS
My Commission Expires
May 26, 2020

## CERTIFICATE

I, the undersigned officer of _____ **RLI Insurance Company** _____ do hereby certify that the attached Power of Attorney is in full force and effect and is irrevocable; and furthermore, that the Resolution of the Company as set forth in the Power of Attorney, is now in force. In testimony whereof, I have hereunto set my hand and the seal of the _____ **RLI Insurance Company** _____ this _____ **4th** day of _____ **March** _____, _____ **2019** _____.

**RLI Insurance Company,**

By: _Jean M. Stephenson_ (signature)
Jean M. Stephenson                                    Corporate Secretary

A0006817_SUBS

# Exhibit 6

**IN THE DISTRICT COURT OF OSAGE COUNTY**
**STATE OF OKLAHOMA**

District Court Osage County, Okla.
FILED

MAR 1 3 2019

Jennifer Burd, Court Clerk
By_____ Deputy

THE TOWN OF FAIRFAX; THE FAIRFAX
PUBLIC WORKS AUTHORITY; and THE TOWN
OF FAIRFAX BOARD OF CONTROL,

                                        Plaintiffs,

vs.

CAH ACQUISITION COMPANY 12, LLC;
HMC/CAH CONSOLIDATED, INC.;
EMPOWER HEALTHCARE, LLC;
RURAL COMMUNITY HOSPITALS OF
AMERICA, LLC; INDIAN ELECTRIC
COOPERATIVE, INC.; SALLY HULSE in her
Official Capacity as OSAGE COUNTY
TREASURER, and JOHN DOES 1-10,

                                        Defendants.

Case No. CJ-2018-232

**NOTICE OF ACTION BY RECEIVER**
**(REMOVAL OF MANAGERS)**

**To:**   **The Managers**
          **CAH Acquisition Company 12, LLC**

YOU ARE HEREBY NOTIFIED that Fairfax Healthcare Authority, in its capacity as

court-appointed receiver (the "Receiver") over all assets and business operations of CAH

Acquisition Company 12, LLC ("CAH 12"), does hereby remove all individuals, persons, and/or

entities as managers of CAH 12.

Pursuant to the Order Appointing Receiver entered herein on February 27, 2019, and the

subsequent Amendment to Order Appointing Receiver, the Receiver has full authority to remove

any and all managers from CAH 12:

> The Receiver shall have the sole power and authority, consistent
> with the terms of the Court's February 27, 2019 *Order Appointing*
> *Receiver*, (i) to oversee and make all final decisions concerning the

litigation relating to CAH 12[1], the CAH 12 Assets and the Other Property, including but not limited to entry of litigation settlements and consent judgement, (ii) to remove any existing managers, and identify and appoint qualified individuals to serve as manager of CAH 12, (iii) analyze, market and sell any or all of the CAH 12 Assets or Other Property, and (iv) manage and operate CAH 12 on a daily basis.

*See* Amendment to Order Appointing Receiver.

The Receiver does hereby exercise said authority. All managers of CAH 12 are hereby immediately removed.

Fairfax Healthcare Authority
By: Charles Cartwright, Trustee

FURTHER AFFIANT SAYETH NOT.

_____

Subscribed and sworn to before me this ___13___ day of March, 2019.

_____
Notary Public
Commission No.: __1700216__

My Commission Expires:

__1|9|2021__
(SEAL)

---

[1] All capitalized terms not defined herein are as defined in the Order Appointing Receiver.

2

## CERTIFICATE OF MAILING

This shall certify that on this 13ᵗʰ day of March, 2019, a true and correct copy of the above and foregoing was mailed, via U.S. mail, postage prepaid, to the following:

Peter W. Brolick
Riggs, Abney, Neal,
Turpen, Orbison & Lewis
502 West Sixth Street
Tulsa, OK 74119

*Attorney for CAH Acquisition Company 12, LLC; Empower Healthcare, LLC; and Rural Community Hospitals of America, LLC*

Ashley J. Kane
Make E. Fisher
628 ½ Kihekah
P.O. Box 147
Pawhuska, OK 74056

*Attorney for Defendant
Osage County Treasurer*

Adrienne N. Cash
Barber & Bartz
525 S. Main St., Suite 800
Tulsa, OK 74103

*Attorney for Indian Electric Cooperative*

J. Clay Christensen
T.P. Howell
Jeffrey E. Tate
Brock Z. Pittman
Christensen Law Group, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, OK
- *and* –
Jess M. Kane
Robinett, King Elias, Buhlinger,
Brown & Kane
P.O. Box 1066
Bartlesville, OK 74005

*Attorneys for Plaintiffs*

Fairfax Healthcare Authority
By: Charles Cartwright, Trustee

STATE OF OKLAHOMA }
COUNTY OF OSAGE } SS

JENNIFER BURD COURT CLERK, In and for Osage County, Oklahoma, do hereby certify that the above and foregoing is a true, correct and complete copy of the original now on file/issue in my office at Pawhuska, Oklahoma, as the same appears of record.

Witness my hand and official seal this 13 day of March 2019
JENNIFER BURD, COURT CLERK
BY _____ DEPUTY

3

# Exhibit 7

## AFFIDAVIT OF REPRESENTATIVE OF HMC/CAH CONSOLIDATED, INC.

STATE OF MISSOURI      )
                           ) SS:

COUNTY OF JACKSON     )

Comes now the undersigned, of lawful age, after being duly sworn, and states and affirms as follows:

1.    I, Gregory G. Swartz, am the President and sole member of the Board of Directors of HMC/CAH Consolidated, Inc. ("HMC") and have been such since September 4, 2018.

2.    CAH Acquisition Company 12, LLC ("CAH 12") is a Delaware limited liability company with two members: (1) HMC and (2) Health Acquisition Company, LLC ("HAC").

3.    CAH 12 is governed by the Second Amended and Restated Limited Liability Company Agreement (the "Agreement").  A true and correct fully executed copy of the Agreement is attached hereto.

4.    The Agreement is a current, valid, and binding Agreement between HMC and HAC.

5.    Pages six and seven of the Agreement provide, in pertinent part, as follows:

Notwithstanding any provision of this agreement to the contrary, the **Company shall not** take enter, approve, cause, consent or permit the Company to take any of the following **actions without the prior <u>unanimous</u> written consent of the Members:**

. . .

(f) initiate a proceeding for the bankruptcy of the Company.

Agreement at ¶ 4.1(f)(6) (emphasis added).

6.    I am now aware that Jorge Perez filed a Chapter 11 bankruptcy case on behalf of CAH 12 on March 17, 2019, in the United States Bankruptcy Court for the Eastern District of North Carolina, Case No.: 19-01229-5 (the "Bankruptcy").

7.    I have not given HMC's written consent for the commencement of the Bankruptcy for CAH 12, nor has anyone else done so while I have been an officer and director of HMC.  Further, I have no knowledge that anyone purporting to act for HMC gave such consent before I became President and Director.

8.    HMC, as a member of CAH 12, never provided its written consent for the commencement of the Bankruptcy proceedings for CAH 12.

9.    Jorge Perez did not have HMC's authorization to initiate the Bankruptcy.

10.    Further, HMC does not consent to the continuance of the Bankruptcy proceeding filed on behalf of CAH 12 in North Carolina.


Signed:  March 21, 2019.

_____
AFFIANT, Gregory G. Swartz

2

County of Jackson

State of Missouri

    Subscribed and sworn to before me, a Notary Public in the above county and state, by Gregory G. Swartz, to me known, who signed the foregoing document in my presence and stated that he did so as his free act and deed.

Notary Public

My Commission Expires: 02-05-2022

KIMBERLY A KLINE
Notary Public – Notary Seal
Jackson County – State of Missouri
Commission Number 18580821
My Commission Expires Feb 5, 2022

3

## SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

## CAH ACQUISITION COMPANY 12, LLC

**THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** is between the undersigned Members of CAH Acquisition Company 12, LLC, a Delaware limited liability company (the *Company*). Capitalized terms used but not defined herein have the meaning assigned to such terms on Schedule 1.

On July 7, 2008, HMC/CAH Consolidated, Inc., a Delaware corporation (*HMC*), caused the Company to be formed as a limited liability company under the Delaware Limited Liability Company Act by the filing of a Certificate of Formation (the *Certificate*) with the Delaware Secretary of State's Office. Promptly thereafter, HMC was issued the entirety of the outstanding Interests. Thereafter, HMC executed one or more Limited Liability Company Agreements for the Company, governing HMC's duties, obligations, rights, privileges and preferences as the sole Member of the Company.

On March 29, 2017, Health Acquisition Company LLC, a West Virginia limited liability company (*HAC*), acquired 80% of the outstanding equity Interests from HMC.

HMC and HAC desire to amend and restate the Limited Liability Company Agreement of the Company to accurately reflect the duties, obligations, rights, privileges and preferences of Members of the Company.

The Members agree as follows:

## 1 BUSINESS PURPOSES; OFFICES

**1.1     Name and Business Purpose.** The name of the Company shall be as stated in the Certificate. The business purpose of the Company is to own and operate a critical access hospital and related medical facilities located in Fairfax, Oklahoma, under the name of Fairfax Community Hospital (the *Hospital*) and to do any and all things necessary, appropriate or incidental thereto. The Company is formed only for such business purpose and shall not be deemed to create any declaration or agreement by the Company or the Members with respect to any other activities whatsoever other than the activities within such business purpose.

**1.2     Powers.** In addition to the powers and privileges conferred upon the Company by law and those incidental thereto, the Company shall have the same powers as a natural Person to do all things necessary or convenient to carry out its business and affairs.

**1.3     Principal Office.** The principal office of the Company shall be located at such places as the Managing Directors determine from time to time.

**1.4     Registered Office and Registered Agent.** The location of the registered office and the name of the registered agent of the Company in the State of Delaware shall be as stated in the Certificate. The registered office and registered agent of the Company in the State of Delaware may be changed, from time to time, by the Managing Directors.

**1.5** **Amendment of the Certificate.** The Company shall amend the Certificate at such time or times and in such manner as may be required by the Act and this agreement.

**1.6** **Liability of Member.** No Member, solely by reason of being a Member, shall be liable, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of any other Member of the Company. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this agreement or the Act shall not be grounds for imposing liability on the Members for liabilities of the Company.

**1.7** **Interest Not Acquired for Resale.** Each Member is acquiring an Interest for the Member's own account as an investment and without an intent to distribute such Interest, which Interest has not been registered under the Securities Act of 1933, as amended, or any state securities laws, and the Member's Interest may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

**1.8** **Status of Agreement.** This agreement is intended to constitute and does constitute a written operating agreement within the meaning and for the purposes of the Act, even during periods (if ever) where the Company has only one Member. To the extent required or contemplated by the Act or applicable law, the Company constitutes a party to this agreement.

**1.9** **General Statutory Override.** To the extent permitted by law, the provisions of this agreement govern over all provisions of the Act that would apply but for (and inconsistently with) this agreement. For each question (a) with respect to which the Act provides a rule (a *Default Rule*) but permits a limited liability company's written operating agreement to provide a different rule and (b) which is addressed by this agreement, the Default Rule does not apply to the Company.

## 2 CAPITAL CONTRIBUTIONS; LOANS; UNITS OF INTERESTS

**2.1** **Interests.** Schedule 2 sets forth the Interest held by each Member.

**2.2** **Additional Capital Contributions.** Each Member has made a contribution to the capital of the Company as set forth on the Company's books and records. No Member shall be obligated to make any other additional contributions to the capital of the Company.

**2.3** **Capital Accounts.** A Capital Account shall be maintained by the Company for each Member and any transferee. No interest will be paid on capital contributions.

      (a)    In general, each Member's Capital Account shall be increased by:

          (1)    the amount of money contributed by the Member;

          (2)    the fair market value of property contributed by the Member (net of liabilities secured by the property that the Company is considered to assume or take subject to); and

(3)     allocations of Income to such Member.

(b)     In general, each Member's Capital Account shall be decreased by:

(1)     the amount of money distributed to such Member;

(2)     the fair market value of property distributed to such Member (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to); and

(3)     allocations of net Losses to such Member.

Notwithstanding anything to the contrary contained herein, each Capital Account shall be determined and maintained in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv) as the same may be amended or revised. The provisions of this Section **Error! Reference source not found.**2.3 as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified by the Managing Directors to cause the allocations of profits, losses, income, gain and credit to have substantial economic effect under the regulations promulgated under Section 704(b) of the Code, in light of the distributions made to the Members and the capital contributions made by the Members.

**2.4     Capital Withdrawal Rights, Interest.** Except as expressly provided in this agreement or as otherwise determined by the Managing Directors, (a) no Member may be entitled to withdraw or reduce the Member's Capital Account or to receive any Distributions, (b) no Member may be entitled to demand or receive any Distributions in any form other than in cash, and (c) no Member may be entitled to receive or be credited with any interest on any balance in the Member's Capital Account at any time.

**2.5     Loans.** A Member may, but is not required to, make loans to the Company in such amounts, at such times, and on such terms and conditions as may be determined by the Managing Directors. Loans by a Member to the Company shall not be considered as contributions to the capital of the Company.

**2.6     Authorized Units.** The Company shall be authorized to issue not more than 100 units of Interests, each unit representing a one percent Interest in the Company. The number of authorized units may be increased only with the unanimous written consent of the Members. No unit of Interest is certificated. Certificates previously issued, if any, shall be void and ineffective to evidence units of membership Interest. The Interests do not constitute a security within the meaning of Article 8 of the UCC.

**2.7     Transfers of Interest.** Transfers of units of Interests shall be made only upon the books of the Company, kept at the office of the Company. The designee of the Managing Directors shall be the transfer agent of the Company.

**2.8     Registered Members.** Only Members whose names are registered in the books of the Company shall be entitled to be treated by the Company as the holders and owners in fact of the units of Interests standing in their respective names, and the Company shall not be bound to recognize any equitable or other claim to or interest in such units of Interest on the part of any

other person, whether or not it shall have express or other notice thereof, except as expressly provided by the Act.

## 3 ALLOCATIONS AND DISTRIBUTIONS

**3.1** **Non-Liquidation Cash Distributions.** The amount, if any, of Available Cash may be determined by the Managing Directors and distributed to the Members, ratably in accordance with their Percentage Interest, at such times as determined by the Managing Directors.

**3.2** **Liquidation Distributions.** Liquidation Proceeds shall be distributed in the following order of priority:

    (a)    To the payment of debts and liabilities of the Company (including to the Members to repay loans made by a Member to the Company) and the expenses of liquidation;

    (b)    Next, to the setting up of such reserves as the Person required or authorized by law to wind up the Company's affairs may reasonably deem necessary or appropriate for any disputed, contingent or unforeseen liabilities or obligations of the Company, provided that any such reserves shall be paid over by such Person to an independent escrow agent, to be held by such agent or its successor for such period as such Person shall deem advisable for the purpose of applying such reserves to the payment of such liabilities or obligations and, at the expiration of such period, the balance of such reserves, if any, shall be distributed as hereinafter provided; and

    (c)    The remainder to the Members in accordance with their Percentage Interest.

**3.3** **Income, Losses and Credits.** The Company's Income or Loss, as the case may be, and applicable credits, for each fiscal year of the Company, as determined in accordance with such method of accounting as may be adopted for the Company, shall be allocated, subject to Section 2.3, to the Members in accordance with their Percentage Interest for both financial accounting and income tax purposes, except as otherwise provided for herein.

**3.4** **Tax Withholding.** Notwithstanding any other provision of this agreement, the Managing Directors may take any action that the Managing Directors determine is necessary or appropriate to cause the Company to comply with any withholding requirements established under any federal, state or local tax law, including, without limitation, withholding on any Distributions to the Members. For all purposes of this Article 3, any amount withheld on any Distributions and paid over to the appropriate governmental body may be treated as if such amount had in fact been distributed to the Member.

**3.5** **Reserves.** The Managing Directors shall have the right to establish, maintain and expend reserves to provide for working capital, for future maintenance, repair or replacement of the Property, for debt service, for future investments and for such other purposes as the Managing Directors may deem necessary or advisable.

# 4 MANAGEMENT

## 4.1    Management by Managing Directors.

(a)    General. Subject to all other provisions of this agreement, the business and affairs of the Company shall be managed by at least three individuals (each a **Managing Director**). The Managing Directors shall be designated by the affirmative vote or written consent of Members holding a Majority Interest. Except as expressly limited by law, the Certificate or this agreement, the Property and the business of the Company shall be controlled and managed by the Managing Directors. The Managing Directors shall have and are vested with all powers and authorities, except as expressly limited by law, the Certificate, or this agreement, to do or cause to be done any and all lawful things for and in behalf of the Company, to exercise or cause to be exercised any or all of its powers, privileges and franchises, and to seek the effectuation of its objects and purposes. In limitation of the powers conferred by this agreement or by statute, the Managing Directors are expressly prohibited from making, repealing, altering, amending or rescinding any or all of this agreement or the Certificate. The Managing Directors act by vote or written consent of a simple majority of the then-serving Managing Directors.

(b)    Fiduciary Duty. Each Managing Director shall exercise their responsibility and duties to the Company with the highest level of fiduciary duty of care and loyalty to the Company, in a prudent business manner, and will take all actions and make all votes in good faith consistent with such duties. Each Managing Director must discharge his duties in good faith, and in a manner that the Managing Director reasonably believes to be in the best interests of the Company. Each Managing Director may rely on information received from other persons if that reliance is consistent with the duties of the Managing Director under this agreement. Each Managing Director shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by any Person as to matters the Managing Director reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, losses, or Available Cash or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

(c)    Delegation of Authority to Adopt Bylaws. At any time and from time to time, the Managing Directors may in their discretion adopt bylaws and rules and procedures (collectively, the **Bylaws**) that are consistent with this agreement, for the purpose of enabling the Managing Directors to carry out their responsibilities. Bylaws shall be subject to the approval of the Members, and the Members retain the right to rescind any authority or procedures delegated to the Managing Directors.

(d)    Delegation of Authority and Appointment of Officers. At any time and from time to time, the Managing Directors may in their discretion designate any Person to carry out the decisions of the Managing Directors or the Members, including, but not limited to, the execution of any instruments on behalf of the Company. The Managing Directors shall have the power and authority to appoint individuals to act as officers of the Company or to act in such other capacities or on such committees as the Managing Directors deem advisable from time to

time, and any such individuals shall serve for such periods and hold such positions, have such power and authority and be subject to such restrictions or limitations, and be entitled to such compensation, as the Managing Directors may determine from time to time. Any number of titles may be held by the same individual. Any appointment or delegation of authority may be revoked, and any individual may be removed from any officer position or other capacity, at any time by the Managing Directors, with or without cause.

(e) Advisory Directors. The Bylaws may authorize and establish procedures for the appointment of advisory directors for the purpose of providing advice and assistance to the Managing Directors in regard to the business and affairs of the Company, provided such advisory directors shall not have any authority to bind, or otherwise take any actions on behalf of, the Managing Directors or the Company.

(f) Restrictions on Authority. Neither the Managing Directors, nor any officer, or other representative of the Company, shall be authorized to act in connection with the following matters, except with the affirmative vote or written consent of Members holding a Majority Interest.

(1) Make any loan to any Member;

(2) Enter into or amend any transaction between the Company and an affiliate of either Member, or establish or pay any salaries, bonuses, or other forms of compensation to Persons who are employees or affiliates of either Member for services as employees, consultants, agents or representatives of the Company;

(3) Terminate, dissolve or windup the Company;

(4) Commingle the Company's funds with those of any other Person;

(5) Change the status of the Company from one in which management is vested in the Managing Directors to one in which management is vested in the Members;

(6) No Managing Director or officer of the Company shall enter into any transaction or agreement on behalf of the Company, nor otherwise take any action on behalf of the Company, unless such transaction, agreement or action is permitted or authorized in accordance with the terms of this agreement.

Notwithstanding any provision of this agreement to the contrary, the Company shall not take enter, approve, cause, consent or permit the Company to take any of the following actions without the prior unanimous written consent of the Members:

(a) make any amendment to or restatement of the Certificate or this Agreement;

(b) effect a sale of all or substantially all of the assets of the Company, or any merger, reorganization, consolidation, or sale of Interests by the Company;

(c)     require the Members to execute and deliver notes, endorsements, letters of credit, guaranties, security bonds, indemnity agreements and similar documents on behalf of or for the benefit of the Company;

(d)     issue any Interests, raise capital, make capital calls, or admit new Members;

(e)     cause a change in the purpose of the Company; or

(f)     initiate a proceeding for the bankruptcy of the Company.

**4.2**          **Actions by Members.** Any consent, approval, decision or other action required or permitted to be taken by the Member, as contemplated in this agreement or required by the Act or other applicable law, may be taken without a meeting, without prior notice and without a vote, if one or more written consents setting forth the consent, approval, decision or other action to be taken shall be signed by Members holding a Majority Interest or unanimously, as applicable. A copy of each written consent to action will be delivered to each Member. Each Member shall designate a Member Representative (and one alternate Member Representative to serve in the absence or unavailability of the designated Member Representative) by notice to the Managing Directors. The ***Member Representative***, which must be an individual, represents the Member at all meetings of the Members and serves as the Member's sole designee to cast votes or execute consents presented for consideration of the Members. A Member may change the identity of its Member Representative by notice to the Managing Directors, which notice shall be effective on receipt by the Managing Directors.

**4.3**          **Confidential Information.** Each Member acknowledges that the Confidential Information is valuable property of the Company and undertakes that for so long as it is a Member, and thereafter until such information otherwise becomes publicly available other than through breach of this Section, it shall:

(a)     Treat the Confidential Information as secret and confidential;

(b)     not disclose (directly or indirectly, in whole or in part) the Confidential Information to any third party except with the prior written consent of Managing Directors;

(c)     not use (or in any way appropriate) the Confidential Information for any purpose other than the performance of the business of the Company and otherwise in accordance with the provisions of this agreement; and

(d)     limit the dissemination of and access to the Confidential Information to such of the Company's Members, Managing Directors, officers, employees, agents or representatives as may reasonably require such information for the performance of Company business and ensure that any and all such persons observe all the obligations of confidentiality contained herein.

**4.4**          **Execution of Documents Filed with Secretary of State of Delaware.** Persons designated from time to time by the Managing Directors shall be authorized to execute and file with the Secretary of State of Delaware any document permitted or required by the Act. Such documents shall be executed and filed only after the Managing Directors, or the Members

to the extent applicable, have approved or consented to such action in the manner provided herein. The Members hereby waives any requirement under the Act of receiving a copy of any document filed with the Secretary of State of Delaware.

### 4.5      Indemnification.

(a)      The Company agrees to indemnify any Member, Managing Directors or officer who was or is a party, or who is threatened to be made a party, to any threatened, pending, or completed civil, criminal, administrative, or investigative action, suit, or proceeding, other than an action by or in the right of the Company, because such Member, Managing Director or officer is or was a Managing Director, Member, officer, employee, or agent of the Company. The Company agrees to indemnify such Member, Managing Director or officer against expenses, including attorneys' fees, judgments, fines, and amounts paid in settlement that actually and reasonably were incurred by such Member, Managing Director or officer in connection with the action, suit, or proceeding if he, she or it acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company and, in connection with any criminal action or proceeding, had no reasonable cause to believe his, her or its conduct was unlawful.

(b)      The Company agrees to indemnify any Member, Managing Director or officer who was or is a party or who is threatened to be made a party to any threatened, pending, or completed action or suit by or in the right of the Company to procure a judgment in its favor, because he, she or it is or was a Member, Managing Director or officer, employee, or agent of the Company. The Company may indemnify or agree to indemnify such Member, Managing Directors or officer against expenses, including attorneys' fees, that were actually and reasonably incurred by him, her or it in connection with the defense or settlement of the action or suit if he, she or it acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company, except that an indemnification shall not be made in respect of any claim, issue, or matter as to which such Member, Managing Director or Officer is adjudged to be liable for negligence or misconduct in the performance of his, her or its duty to the Company unless and only to the extent that a court of competent jurisdiction or the court in which the action or suit was brought determines, upon application, that, despite the adjudication of liability, but in view of all the circumstances of the case, such Member, Managing Director or officer is fairly and reasonably entitled to indemnification for expenses that the court considers proper.

(c)      To the extent a Member, Managing Director or officer, employee, or agent of the Company has been successful on the merits or otherwise in defense of any action, suit, or proceeding referred to in Section 4.5(a) or Section 4.5(b) or has been successful in defense of any claim, issue, or matter in an action, suit, or proceeding referred to in those divisions, he, she or it shall be indemnified against expenses, including attorneys' fees, that were actually and reasonably incurred by him, her or it in connection with the action, suit, or proceeding.

(d)      Unless ordered by a court and subject to Section 4.5(c), any indemnification under Section 4.5(a) or Section 4.5(b) shall be made by the Company only as authorized in the specific case, upon a determination by the Company that indemnification of the

Members or Managing Director, officer, employee, or agent is proper under the circumstances because he, she or it has met the applicable standard of conduct set forth in Section 4.5(a) or Section 4.5(b).

(e)     The indemnification authorized by this Section 4.5 is not exclusive of and shall be in addition to any other rights granted to those seeking indemnification under this agreement under any statute, provision of the Certificate, consent of disinterested Members or disinterested Managing Directors or otherwise.

(f)     The Managing Directors, may to the fullest extent permitted by law authorize the purchase of insurance at the Company's expense to indemnify the Company for any obligation it incurs as a result of the indemnification of Managing Directors, officers and employees and to indemnify or insure Managing Directors, officers and employees against liability in such instances in which they may not otherwise be indemnified by the Company.

## 5 ACCOUNTING AND BANK ACCOUNTS

**5.1**     **Fiscal Year.** The fiscal year and taxable year of the Company shall end on September 30th of each year, unless a different year is required by the Code or otherwise established by the Managing Directors.

**5.2**     **Books and Records.** At all times during the existence of the Company, the Company shall cause to be maintained full and accurate books of account, which shall reflect all Company transactions and be appropriate and adequate for the Company's business. The books and records of the Company shall be maintained at the principal office of the Company. The Members (or a Member Representative) shall have the right during ordinary business hours and upon reasonable notice to inspect and copy (at the Member's own expense) all books and records of the Company.

**5.3**     **Bank Accounts.** All funds of the Company shall be deposited in a separate bank, money market or similar account(s) approved by the Managing Directors and in the Company's name. Withdrawals therefrom shall be made only by Persons authorized to do so by the Managing Directors.

## 6 TRANSFERS OR ENCUMBRANCE OF INTERESTS

**6.1**     **Transfer and Assignment of Interests.** No Member shall be entitled to Transfer all or any part of his or her Interest in the Company except upon compliance with Section 6.6 hereof and with the prior written consent of Members holding a Majority Interest, which consent may be given or withheld, conditioned or delayed (as allowed by this agreement or the Act), as the other Members may determine in their sole discretion. After the consummation of any Transfer of any part of an Interest, the Interest so Transferred shall continue to be subject to the terms and provisions of this agreement and any further Transfers shall be required to comply with all the terms and provisions of this agreement.

**6.2**     **Substitution of Members.** A transferee of an Interest shall have the right to become a substitute Member only if (a) the requirements of Section 6.1 are satisfied, (b) such transferee executes an instrument satisfactory to the Managing Directors accepting and adopting

the terms and provisions of this agreement, and (c) such transferee pays any reasonable expenses in connection with his or her admission as a substitute Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

**6.3** **Effective Date of Permitted Transfers.** Any permitted transfer of all or any portion of an Interest shall be effective as of the first business day following the date upon which the requirements of Sections 6.1 and 6.2 have been met. The Managing Directors shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 6.1 and 6.2 have been met. Any transferee of an Interest shall take subject to the restrictions on transfer imposed by this agreement.

**6.4** **Rights of Legal Representatives.** If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his or her legal representative or successor.

**6.5** **No Effect to Transfers in Violation of Agreement.** Upon any transfer of a Membership Interest in violation of this Article 6, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become the owner of an Economic Interest Owner and thereafter shall only receive the share of one or more of the Company's net profits, net losses and Distributions to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Managing Directors, a transfer in violation of this Article 6 would cause the termination of the Company under the Act, in the sole discretion of the Managing Directors, the transfer shall be null and void and the purported transferee shall not become either a Member or the owner of an Economic Interest Owner.

6.6 **Tag Along; Drag Along.** If at any time one or more Members (the "Selling Member(s)") desires to sell Membership Units representing 40% or more of the Percentage Interests (the "Subject Interest") in one or more series of transactions to a Person that is not an Affiliate of the Selling Member:

(a) The Selling Member(s) will give to each other Member(s) (collectively the "Other Members") a written copy of the terms of sale, including a written description of the Subject Interest, the name of the proposed purchaser, the purchase price and payment terms and other terms offered by the proposed purchaser, and offer the Other Members the right to elect to participate in the sale as a seller of all of such Other Member's Membership Units along with the sale by the Selling Member(s) for the same consideration per percent of Percentage Interest and on the same terms relating to the Membership Units as the Selling Member(s) subject to appropriate adjustments to reflect (i) disproportionate Capital Account balances and (ii) the amount the Members would receive upon a liquidation of the Company in the event the purchase price was received by the Company and distributed to the Members in accordance with Section 3.2 and tax allocations were made (the "Offer"). The Selling Member(s) will give the Other Members a period of 25 days to accept the Offer. The Other Member(s) exercising such right will give written notice of exercise to the Company and the other applicable Members by the end of such 25 day period.

(b)     The Selling Member(s) will also have the right to require all (but not less than all) of the Other Members to participate in the sale as sellers of their Membership Units along with the sale by the Selling Member(s) for the same consideration per percent of Percentage Interest and on the same terms relating to the Membership Units as the Selling Member(s) subject to appropriate adjustments to reflect (i) disproportionate Capital Account balances and (ii) the amount the Members would receive upon a liquidation of the Company in the event the purchase price was received by the Company and distributed to the Members in accordance with Section 3.2 and tax allocations were made.

(c)     At the closing, each Other Member electing to participate pursuant to subsection (a) above or required to participate pursuant to subsection (b) above will execute and deliver all documents as may be reasonably required to effectuate the transfer of the applicable Membership Units, free and clear of all liens, claims and encumbrances of any type, other than this Agreement, and each such Member will execute such other instruments as may be reasonably required of all participating Members. If (i) the Selling Member(s) exercise the right to require the Other Members to sell their Membership Units along with the Selling Member(s), and (ii) any Other Member actively opposes or refuses to cooperate in such sale, then, in such circumstances, all Selling Members are hereby granted a limited power-of-attorney to act for and in the name of any such Other Member to execute any and all documentation in connection with the sale of the Other Member's Interest that the Selling Member(s) deem necessary to consummate the transaction. All employment, consulting, covenant not to compete and similar payments or amounts to be paid, directly or indirectly, to a Member or its Affiliates by the purchaser or its Affiliates (and not all Members on a Percentage Interest basis) will be limited to reasonable amounts.

## 7 DISSOLUTION AND TERMINATION

**7.1     Events Causing Dissolution.** The Company shall be dissolved only upon the first to occur of the following events:

(a)     The vote of the Members; or

(b)     Upon the entry of a decree of judicial dissolution under Section 18-802 of the Act.

**7.2     Effect of Dissolution.** Except as otherwise provided in this agreement, upon the dissolution of the Company, the Managing Directors shall take such actions as may be required pursuant to the Act and shall proceed to wind up, liquidate and terminate the business and affairs of the Company, including the designation of a Person to act as the *Liquidator*. In connection with such winding up, the Liquidator shall have the authority to liquidate and reduce to cash (to the extent necessary or appropriate) the assets of the Company as promptly as is consistent with obtaining fair market value therefor, to apply and distribute the proceeds of such liquidation and any remaining assets in accordance with this agreement, and to do any and all acts and things authorized by, and in accordance with, the Act and other applicable laws for the purpose of winding up and liquidation.

**7.3    Application of Proceeds.** Upon dissolution and liquidation of the Company, the assets of the Company shall be applied and distributed in the order of priority set forth in Section 3.2.

## 8 GENERAL MATTERS

**8.1    Permissible Relationships.** The Members understand that the Company's and the Hospital's operations are subject to various state and federal laws regulating permissible relationships between the Members and entities such as the Company, including 42 U.S.C. 1320a-7b(b) (the *Anti-Kickback Statute*), and 42 U.S.C. 1395nn (the *Stark Act*). It is therefore the intent of the Members and the Company that any agreement, relationship or transaction by and among them, including this agreement, comport with the foregoing statutes and substantially comply with the Anti-Kickback Statute safe harbors, and that the Company and the Hospital operate in a manner consistent with the same. Accordingly, each Member represents and warrants that it has not been excluded or suspended from participation in the Medicare and/or Medicaid programs, and no Manager will be designated that is excluded or suspended from such participation.

**8.2    Title to the Property.** Title to the Property shall be held in the name of the Company. The Members shall not have any ownership interest or rights in the Property, except indirectly by virtue of the Member's ownership of an Interest.

**8.3    Nature of Interest in the Company.** An Interest shall be personal property for all purposes.

**8.4    Notices and Determinations.** Any notice or determination required or permitted to be given or made by this agreement or the Act shall be sufficient if given or made in writing.

**8.5    No Third Party Rights.** None of the provisions contained in this agreement shall be for the benefit of or enforceable by any third parties, including, but not limited to, creditors of the Company; provided, however, the Company may enforce any rights granted to the Company under the Act, the Certificate, or this agreement.

**8.6    Amendments to this Agreement.** This agreement shall not be modified or amended in any manner except in a writing signed by the Members.

**8.7    Rules of Construction.** This agreement is interpreted in accordance with the rules of construction set forth on the attached Schedule 1.

**8.8    Severability.** If any provision of this agreement is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this agreement shall not be affected thereby and shall remain in full force and effect and shall be enforced to the greatest extent permitted by law.

**8.9    Binding Agreement.** The provisions of this agreement are binding upon, and will inure to the benefit of, the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

**8.10**     **Headings.** The headings of the Certificate and the sections of this agreement are for convenience only and shall not be considered in construing or interpreting any of the terms or provisions thereof and hereof.

**8.11**     **Governing Law**. This agreement shall be govern by, and construed in accordance with, the laws of the state of Delaware.

The undersigned Members are signing this Second Amended and Restated Operating Agreement of CAH Acquisition Company 12, LLC, effective as of July ___, 2017.

HEALTH ACQUISITION COMPANY LLC

By: _____

Its: _____ CEO

Notice Address:  1700 Swift Ave.
North Kansas City, MO 64116

HMC/CAH Consolidated, Inc.

By: _____
       Steve Dunn
Its: Vice Chairman

Notice Address: c/o White Goss
               4510 Belleview Suite 300
               Kansas City, MO 64111
               Attn: Kimberley Spies

Schedule 1

**Definitions; Rules of Construction**

1.  **Defined Terms**. As used herein, the following terms have the following meanings:

(a)  **Act** means the Delaware Limited Liability Company Act, as amended from time to time.

(b)  **Available Cash** means the aggregate amount of cash on hand or in bank, money market or similar accounts of the Company as of the end of each fiscal quarter derived from any source (other than capital contributions and Liquidation Proceeds) that the Managing Directors determine is available for distribution to the Members after taking into account any amount required or appropriate to maintain a reasonable amount of reserves.

(c)  **Capital Account** means the account established and maintained by the Company for a Member.

(d)  **Code** means the Internal Revenue Code of 1986, as amended from time to time.

(e)  **Confidential Information** means any and all policies, procedures, contracts, quality assurance techniques, managed care initiatives, utilization management, patient records, credentialing, financial, statistical and other information of the Company, including (but not limited to) information embodied on magnetic tape, computer software or any other medium for the storage of information, together with all notes, analyses, compilations, studies or other documents prepared by the Company or others on behalf of the Company containing or reflecting such information. Confidential Information does not include information which:

(i)  was lawfully made available to or known by third persons on a non-confidential basis prior to disclosure by a Member;

(ii)  is or becomes publicly known through no wrongful act of a Member; or

(iii)  is received by a Member other than in breach of confidence.

(f)  **Distributions** mean any distributions of Available Cash, dividends, interest and other cash payments with respect to a Member's Interest, and any non-cash distributions in respect to a Member's Interest, including without limitation all other or additional Interests or other securities or property (other than cash) distributed by way of dividend or distribution in respect of a Member's Interest (i) by way of split, spin-off, split-up, recapitalization, reclassification, combination of interest, or similar rearrangement or (ii) by reason of any liquidation consolidation, merger, exchange, exchange offers, conveyance of assets, exercise of options, contribution of capital, liquidation or similar reorganization.

        (g)     ***Economic Interest*** shall mean a Member's or the owner of Economic Interest share of one or more of the Company's net profits, net losses, and Distributions of the Company's assets pursuant to this agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management, or except as provided in the Act, any right to information concerning the business and affairs of Company.

        (h)     ***Income*** and ***Loss*** mean, respectively, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with the Code.

        (i)     ***Interest*** shall mean a Member's entire interest in the Company including the Member's share of one or more of the Company's Income and Loss, and Distributions, the right to vote on or participate in the management of the Company, and the right to receive information concerning the business and affairs, of the Company, all pursuant to this agreement and the Act.

        (j)     ***Liquidation Proceeds*** means all Property at the time of liquidation of the Company and all proceeds thereof.

        (k)     ***Majority Interest*** means Members which taken together exceed 50% of the aggregate of all Percentage Interests.

        (l)     ***Medicaid*** means the medical assistance program established by Title XIX of the Social Security Act (42 USC §§1396 et seq.) and any statutes succeeding thereto, as applicable to the Hospital.

        (m)     ***Medicare*** means the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 USC §§1395 et seq.) and any statutes succeeding thereto.

        (n)     ***Percentage Interest*** for each Member means the number of units of Interest of such Member divided by the total number of units of Interest then issued and outstanding.

        (o)     ***Person*** means any individual, partnership, limited liability company, Company, cooperative, trust or other entity.

        (p)     ***Property*** means all properties and assets that the Company may own or otherwise have an interest in from time to time.

        (q)     ***Transfer*** means when used as a verb, to give, sell, exchange, assign, transfer, pledge, hypothecate, bequeath, devise or otherwise dispose of or encumber, and when used as a noun, the nouns corresponding to such verbs, in either case voluntarily or involuntarily, by operation of law or otherwise.

        (r)     ***UCC*** means the Uniform Commercial Code as in effect in the State of Delaware from time to time.

2.  **Rules of Construction**. Unless the context clearly requires otherwise:

(a)  Words denoting the singular only are deemed to include the plural and vice versa;

(b)  Words denoting one gender are deemed to include all genders;

(c)  References to articles, sections and schedules, exhibits or appendices are to articles, sections of and schedules or appendices to this agreement and a reference to a subsection is, unless otherwise indicated, deemed to be a reference to a subsection of the section in which the reference appears;

(d)  Headings to sections are for convenience only and are to be ignored in construing this agreement;

(e)  References to any statute, code or statutory provision are to be construed as a reference to the same as it may have been, or may from time to time be, amended, modified or re-enacted, and include references to all bylaws, instruments, orders and regulations for the time being made thereunder or deriving validity therefrom unless the context clearly requires otherwise;

(f)  Except to the extent that the context otherwise requires, any reference in this agreement to any agreement, deed or instrument is a reference to such agreement, deed or instrument as amended, supplemented, restated or otherwise modified from time to time and includes a reference to any document which amends, supplements, restates, modifies or is entered into, made or given pursuant to or in accordance with any of the terms of such agreement, deed or instrument;

(g)  The words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation"; and

(h)  The words "herein", "hereof" and "hereunder", and words of similar import, are construed to refer to this agreement in its entirety and not to any particular provision hereof.

(i)  All Members participated equally in the negotiation and drafting of this agreement. Any ambiguity in interpretation or application of the terms and provisions of this agreement cannot be construed against any Member.

## Schedule 2

### Interests

| Member | Interests |
| --- | --- |
| Health Acquisition Company LLC | 80 |
| HMC/CAH Consolidated, Inc. | 20 |

Beckman Coulter
ATTN:  Managing Agent/Officer
250 South Kraemer Blvd.
Brea, CA  92821-6232

Miller EMS, LLC
ATTN:  Managing Agent/Officer
514 1st Street
Medford, OK  73759-2421

Rural Community Hospitals of
ATTN:  Managing Agent/Officer
700 Chappell Road
Charleston, WV  25304-2704

Gemino Healthcare Finance
ATTN:  Managing Agent/Officer
1 International Plaza, Suite 220
Philadelphia, PA  19113-1538

Patriot Placement Staffing
ATTN:  Managing Agent/Officer
2105 Briarwood Drive
Amarillo, TX  79124-1103

Shared Medical Services, Inc.
ATTN:  Managing Agent/Officer
PO Box 330
Cottage Grove, WI  53527-0330

Hippa-Guard
ATTN:  Managing Agent/Officer
1608 S. Ashland Ave. #86038
Chicago, IL  60608-2013

PLICO
ATTN:  Managing Agent/Officer
PO Box 1838
Oklahoma City, OK  73101-1838

Shi Headquarters
ATTN:  Managing Agent/Officer
300 Davidson Avenue
Somerset, NJ  08873-4175

IHEALTHCARE, Inc.
ATTN:  Managing Agent/Officer
3901 NW 28th St., 2nd Floor
Miami, FL  33142-5609

PRN Funding, LLC
ATTN:  Managing Agent/Officer
25101 Chagrin Blvd., Ste. 250
Beachwood, OH  44122-5687

Sizewize
ATTN:  Managing Agent/Officer
PO Box 320
Ellis, KS  67637-0320

Labcorp
ATTN:  Managing Agent/Officer
PO Box 12140
Burlington, NC  27216-2140

Quality Systems, Inc.
ATTN:  Managing Agent/Officer
PO Box 511449
Los Angeles, CA  90051-8004

Standley Systems
ATTN:  Managing Agent/Officer
PO Box 460
Chickasha, OK  73023-0460

Medline Industries, Inc.
ATTN:  Managing Agent/Officer
8001 SW 47th Street
Wheatland, OK  73097

Reboot, Inc.
ATTN:  Managing Agent/Officer
PO Box 775535
Chicago, IL  60677-5535

State of OK-OSU Cntr for Hlth Sci
ATTN:  Managing Agent/Officer
1111 W. 17th Street
Tulsa, OK  74107-1886

Sysco Food Services
ATTN:  Managing Agent/Officer
PO Box 1127
Norman, OK  73070-1127

Trucode, LLC
ATTN:  Managing Agent/Officer
PO Box 5847
Alpharetta, GA  30023-5847

CAH Acquisition Company 12, LL
ATTN:  Managing Agent/Officer
PO Box 955734
Saint Louis, MO  63195

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IN RE:                                    CASE NO.:  19-14362-AJC

DEQUEEN MEDICAL CENTER, INC.,              CHAPTER 11

DEBTOR.

_____/

### DECLARATION OF RACHEL MATHESON IN SUPPORT
### OF SEVIER COUNTY, ARKANSAS' EMERGENCY MOTION
### TO DISMISS CHAPTER 11 CASE AND INCORPORATED BRIEF IN SUPPORT

1. I am an adult resident of the State of Arkansas.

2. I have personal knowledge of the facts contained herein and submit this Affidavit in support of Sevier County, Arkansas' Emergency Motion to Dismiss Chapter 11 Case and Incorporated Brief in Support ("Motion").

3. I have read the Motion, and the exhibits attached thereto, and the facts contained therein are true and correct to the best of my knowledge, information, and belief.

4. I am a licensed registered nurse and have worked at DeQueen Medical Center, Inc. ("DMCI") for approximately seventeen (17) years. For approximately one year, I have served as the Director of Nursing. I am presently the state appointed receiver for DMCI, and I was appointed on March 28, 2019.

5. DMCI's sole business is the ownership and operation of a community hospital located in Dequeen, Arkansas. DMCI is an Arkansas for-profit corporation with its principal assets are located in Arkansas.

6. DMCI operates as a licensed Critical Access Hospital in DeQueen, Sevier County, Arkansas, and the emergency room in this facility provides the only emergency services within an hour's drive for many residents in Sevier County (the "Hospital").

7. DMCI is, and has been, unable to pay its debts as they become due. Employees have been laid off or quit because they have not been compensated, and healthcare professionals essential to the operation of the Hospital have discontinued providing their medical services.

8. DMCI has received notice of its violations of the Emergency Medical Treatment and Labor Act and various Centers for Medicare and Medicaid Services ("CMS") regulations by the Arkansas Department of Health ("ADH"). DMCI was given until March 29, 2019, to have a corrective action plan approved.

9. Raj Ravi, acting on behalf of DMCI, submitted a corrective action plan to CMS and to ADH on March 14, 2019. CMS personnel visited DMCI on March 26, 2019, and found that none of the proposed action had been taken.

10. On March 25, 2019, Sevier County, Lisa Moser, Ashley Knittig, and Chad Klitz sued DMCI, Jorge Perez, and Ricardo Perez in the Circuit Court of Sevier County, Arkansas, Case No. 67CV-19-16. Sevier County also sought the appointment of a state court receiver over DMCI itself, its Hospital operations, and its assets.

11. On March 28, 2019, the Sevier County Circuit Court entered an order appointing me as receiver over DMCI, its operations including the Hospital, and its assets (the "Receiver Order"). A true and correct copy of the Receiver Order is attached to the Motion as Exhibit "A."

12. At the time I was appointed, DMCI had failed to timely and fully pay employees their wages and salaries as they became due; pay physicians and providers; pay taxes; pay the claims of vendors; pay basic utilities; stock the Hospital with necessary supplies and medications; supply food for the Hospital's patients; and appropriately respond to CMS Notices

**Exhibit "E"**

13. Since I was appointed, I have been working with CMS and ADH to undertake corrective actions to ensure the continued licensure and certification of DMCI and the Hospital. This includes seeking approval for and obtaining a line of credit to pay for utilities, meet the payroll obligations, fully supply the Hospital, and pay other necessary costs.

14. To further clarify my authority to operate DMCI, the Sevier County Circuit Court entered its Amended Temporary Restraining Order and Order Appointing Temporary Receiver" (the "Amended Order"). A true and correct copy of the Amended Order is attached to the Motion as Exhibit "C."

15. I did not authorize the filing of the bankruptcy petition in the presently pending bankruptcy case.

16. On April 3, 2019, I exercised the authority granted to me by the Circuit Court of Sevier County, Arkansas to remove all directors from DMCI, including Jorge Perez, the former president of DMCI.

17. For approximately seven weeks, DMCI has been on diversion status. The ambulance service will not bring patients to the Hospital because of the lack of supplies.

18. The Hospital currently has no healthcare professionals, no supplies, no food, and accordingly, no patients despite the fact that it has twenty-five (25) empty hospital beds.

19. ADH and CMS have contacted me to notify me that those regulatory agencies are in the process of reviewing DMCI's certification. Without immediate corrective action, I have a well-founded fear and concern that DMCI's certification and licensure may be revoked immediately.

20. Because the Hospital is in an older building, DMCI is grandfathered-in to current licensure and is not required to meet more modern facility safety codes. If the licensure and certificate are revoked, DMCI will be unable to reobtain licensure in its current facility and will be unable to reopen.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 8, 2019.

RACHEL MATHESON